# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT OF THE EASTERN
DISTRICT  OF PENNSYLVANIA
-----------------------------------------
TRISHA TSHUDY
762 Palmyra Bellegrove Road
Annville, PA 17003

                    Plaintiff,


PENNSYLVANIA STATE UNIVERSITY
1600 Woodland Road
Abington, PA 19001,

                    Defendant.

-----------------------------------------




              AUDIO TRANSCRIPTION

       LENGTH OF AUDIO FILE: 4:32:14


          MAGNA LEGAL SERVICES
     320 West 37th Street, 12th Floor
        New York, New York 10018
             (866)624-6221






Reported by:  Marissa Mignano

Job Number:   870204



## Page 2

```
 1              Proceedings
 2        MS. TSHUDY:  This is not being
 3  recorded --
 4        DEAN WILLIAMS:  It will be
 5  recorded.
 6        MS. TSHUDY:  It will be; okay.
 7        DEAN WILLIAMS:  Yes, it will be
 8  recorded.
 9        MS. TSHUDY:  Okay.
10        DEAN WILLIAMS:  We are required
11  under the honor code to electronically
12  preserve the record.
13        I will tell you while it's just
14  us, you will not want to do your
15  deliberation in this room.  Because of
16  that, I have reserved Room 124, the
17  videoconference room over there, all
18  afternoon so you all have that
19  conference room at your disposal.  So
20  when you are ready to deliberate, please
21  leave this room, go there and then come
22  back.
23        PROFESSOR GOULD:  Yes, that will
24  be offered.
25        MS. TSHUDY:  Our deliberations
```

## Page 3

```
 1              Proceedings
 2  don't have to be recorded, right?
 3        DEAN WILLIAMS:  Your deliberation
 4  should not be recorded, which is why --
 5        MS. TSHUDY:  Because, I remember
 6  last time we did it, just in case.
 7        DEAN WILLIAMS:  Yes, and then they
 8  were erased.
 9        MS. TSHUDY:  Okay.
10        DEAN WILLIAMS:  So that they were
11  not part of the permanent record.  So
12  your deliberation should not be
13  recorded.  They should be your -- you
14  should feel free to do that as -- openly
15  as -- so you don't feel like you're
16  being watched.
17        What's your preference,
18  Professor Butler, on the timing here?
19        PROFESSOR BUTLER:  Give her five
20  minutes, academic hour.
21        DEAN WILLIAMS:  Okay.
22        PROFESSOR BUTLER:  If not, we'll
23  start.
24        PROFESSOR GOULD:  Okay.  So it
25  continues if she's not here?
```

## Page 4

```
 1              Proceedings
 2        DEAN WILLIAMS:  I believe,
 3  Professor Butler, that's your call.  But
 4  that would be my recommendation.
 5        PROFESSOR BUTLER:  That's my call.
 6        MS. TSHUDY:  I have a random
 7  question.
 8        DEAN WILLIAMS:  Yes, ma'am.
 9        MS. TSHUDY:  Where is Z?  Like,
10  where is Z█ (phonetic)?
11        DEAN WILLIAMS:  I'm sorry, what?
12        MS. TSHUDY:  Z█ V█, the other
13  Honor Board member.
14        DEAN WILLIAMS:  So the way the
15  Honor Board is constructed for each
16  hearing, the Honor Committee is all of
17  you, the six students.  One of you is
18  the chair.  And then the chair gets to
19  appoint members of the committee to the
20  hearing board.  In this case, █
21  appointed Professor Butler, and asked
22  him to be president of the hearing
23  board, appointed Professor Riesmeyer,
24  and then appointed the three of you as
25  the students, as required under the
```

## Page 5

```
 1              Proceedings
 2  hearing board.
 3        MS. TSHUDY:  Okay.  So there are
 4  always going to be more of us than there
 5  will be --
 6        DEAN WILLIAMS:  Yes.
 7        MS. TSHUDY:  -- that are here.
 8        DEAN WILLIAMS:  That's the way the
 9  honor code is constructed.  The hearing
10  board is always pulled from the Honor
11  Committee, made up of two faculty
12  members and three students.  And if you
13  give me a second -- that is Section five
14  point -- I put the honor code in your
15  packet so that you would have it.  So in
16  5.3B on page 10, The hearing board shall
17  consist of five Honor Committee members,
18  three student members, and two faculty
19  members appointed by the chair.  The
20  honor code administrator, me, and the
21  chair, █, shall not serve on a
22  hearing board.  So those are the
23  requirements and limitations for the
24  hearing board.
25  █:  (Inaudible) That they
```



Page 6

```
1              Proceedings
2  had to be here before 1:00?
3       DEAN WILLIAMS:  The note that I
4  sent to everyone that said, please be
5  here at 12:45, she was copied on.
6  ████████████████:  If something came up,
7  would she have emailed you?
8       DEAN WILLIAMS:  I can look.  My
9  guess is she may have been with
10 Professor Butler since she has been
11 communicating with him.  I have nothing
12 in my email.
13      UNKNOWN SPEAKER:  (Inaudible) I
14 was waiting outside.
15      DEAN WILLIAMS:  Oh, no.  I'm
16 sorry.  We've been waiting for you.
17      UNKNOWN SPEAKER:  I wasn't sure,
18 so --
19      DEAN WILLIAMS:  Have a seat right
20 there.
21      UNKNOWN SPEAKER:  It says
22 restricted access, so I didn't know.
23      DEAN WILLIAMS:  We normally come
24 in this door.
25      UNKNOWN SPEAKER:  Oh, okay.  That
```

Page 7

```
1              Proceedings
2  makes sense.
3       PROFESSOR BUTLER:  Is your witness
4  in the --
5       MS. TSHUDY:  Yeah, he's using the
6  restroom.
7       DEAN WILLIAMS:  Okay.
8       (Crosstalk.)
9       DEAN WILLIAMS:  Yeah, he can come
10 in this door and then just sit back here
11 right behind you.
12      MS. TSHUDY:  Okay.
13      PROFESSOR BUTLER:  Just give him a
14 minute.
15      DEAN WILLIAMS:  Yes, absolutely.
16 Did you find it?
17 ████████████:  Oh, yeah, I found the
18 knob.  I just twisted for days and days.
19 This is definitely better.
20      DEAN WILLIAMS:  I love these
21 chairs, infinitely adjustable.
22      Is it warm in here or is it me?
23      Seth, is there a way to adjust
24 this?
25      MS. TSHUDY:  No, I just read it.
```

Page 8

```
1              Proceedings
2       PROFESSOR GOULD:  To your laptop.
3       MS. TSHUDY:  Okay.  Thank you.
4       DEAN WILLIAMS:  If you don't mind,
5  go ahead and put the projector on.
6       PROFESSOR RIESMEYER:  Let me just
7  pull this down.  Apparently Tom did say
8  we're allowed to open a window a little
9  bit if need be.
10      DEAN WILLIAMS:  Oh, that would be
11 really great.
12      Do you want to just sit right
13 here?
14      PROFESSOR BUTLER:  Then we'll
15 begin.
16      MS. TSHUDY:  Thank you.
17      PROFESSOR BUTLER:  So good
18 afternoon, members of the Honor board,
19 Trisha and Dean Williams.  We're here
20 this afternoon to conduct an honor code
21 hearing to consider an allegation of
22 violation of academic integrity under
23 the Dickinson Law honor code.
24      I'm Professor William Butler.  I'm
25 a member of the Dickinson Law faculty.
```

Page 9

```
1              Proceedings
2  I am a member of the honor code
3  committee.  I have been designated by
4  the chairman of that committee to act as
5  president of this hearing board.  I am
6  joined by Professor Megan Riesmeyer, on
7  my right; by 2L student, ███████, my
8  left; and by 1L students, ███████,
9  and ███████, on my far right.
10      Professor James Gould has filed a
11 report of suspected violation of the
12 Dickinson Law honor code with Dean
13 Williams.  And in her role as
14 administrator of the honor code, and in
15 accordance with the honor code, the
16 purpose of this proceeding is to
17 determine whether Ms. Tshudy has
18 committed violations of the honor code,
19 and if we make such determination to
20 determine the appropriate sanctions.
21      The honor code requires that I
22 arrange for testimony to be
23 electronically preserved, and therefore,
24 this meeting is recorded.  But the
25 deliberations of this body will not be
```



Page 10

```
 1              Proceedings
 2   recorded.  The conduct of the hearing is
 3   defined in Section 5.5 of the honor
 4   code, and I think everybody has seen a
 5   copy of that.
 6        Dean Williams will first question
 7   Professor Gould, then Ms. Tshudy may
 8   question him.  Dean Williams will then
 9   follow up with any additional questions
10   that she may have, and any member of
11   this board may ask questions when they
12   wish.  Ms. Tshudy may also present her
13   testimony and she may be questioned,
14   although she is not obligated to do so
15   under Article Section 3.2D of the honor
16   code.
17        It's my responsibility to rule on
18   any procedural matters that come up.  I
19   will also rule on the admissibility of
20   evidence based on relevance and
21   fairness.  We are not bound by the
22   formal rules of evidence.
23        This board may draw adverse
24   inferences in accordance with Section
25   5.6 of the honor code.  So, hey, we may
```

Page 11

```
 1              Proceedings
 2   draw an adverse inference against an
 3   accused student who, upon request, fails
 4   or refuses to produce relevant real
 5   evidence in her possession or control.
 6   And the board may draw an adverse
 7   inference against the accused student
 8   for remaining silent during the stage
 9   only in determining the appropriate
10   sanctions after finding a violation.
11        After all the testimony is
12   presented, the hearing board will
13   convene on its own, and we will leave
14   this room, to determine whether a
15   violation has occurred.  The presenter
16   must prove the facts of the case by
17   clear and convincing evidence.  This is
18   not a "beyond the reasonable doubt"
19   standard.
20        So in order to find the student
21   guilty of an honor code violation, four
22   members of this board must be persuaded
23   that, first, the presenter proved the
24   alleged facts and, second, the conduct
25   proved by the presenter violates the
```

Page 12

```
 1              Proceedings
 2   honor code.
 3        If this board finds that a
 4   violation occurred, the board may then
 5   impose sanctions and four of the five
 6   members of the meeting board must
 7   approve the sanctions that are imposed.
 8   If the hearing board imposes a sanction
 9   of suspension or expulsion from the law
10   school, all members of the hearing board
11   must agree.  The range of possible
12   sanctions is set out in chapter 6 of the
13   code.
14        So at this point, I turn the floor
15   over to Dean Williams to get us figured.
16        DEAN WILLIAMS:  Thank you,
17   Professor Butler.
18        I think you all know me, but for
19   purposes of the record, I'm Dickinson
20   Law Associate Dean Laura Williams.  I am
21   here today in my role as honor code
22   administrator.
23        We're here this afternoon to
24   consider a case of purported plagiarism.
25   In my role as honor code administrator,
```

Page 13

```
 1              Proceedings
 2   I received a report of alleged
 3   violations of academic integrity filed
 4   by Professor James Gould.
 5   Professor Gould reported that he
 6   suspected that the final paper turned in
 7   by Ms. Tshudy in the Biotech
 8   Pharmaceuticals and the law course in
 9   the fall of 2021, may not have been her
10   own work -- entirely her own work.
11        The substance of the allegation is
12   that Ms. Tshudy submitted a final paper
13   that was substantially similar to a
14   published law review note authored by
15   Hannah-Alise Rogers without
16   acknowledgment of Ms. Rogers' work.
17   That note was published in 2014 in the
18   Journal of Intellectual Property Law and
19   is called Trade Secrets Rising:
20   Protecting Equivalency Test Research and
21   Development Investments after Momenta
22   versus Amphastar.  This law review note
23   is available via Digital Commons.  You
24   all have received copies of these
25   documents.
```



Page 14

```
 1              Proceedings
 2         A few procedural matters.  So I
 3    wanted to take a minute to review the
 4    procedural matters to date.  I've
 5    included a copy of the honor code in
 6    your packet if you want to follow along.
 7    Under the honor code, Professor Gould
 8    sent me the information about the
 9    alleged violation on Friday,
10    December 31, 2021.  And under
11    Section 5.1 on page 10 of the honor
12    code, any person affiliated with the law
13    school may submit a report of suspected
14    violations.
15         Professor Gould sent me
16    Professor -- Ms. Tshudy's paper and he
17    sent me a version with some yellow
18    highlighting where he quickly identified
19    things he believed were the same between
20    Ms. Tshudy's paper and Ms. Roger's law
21    review note.
22         As part of my initial
23    investigation in my role as honor code
24    administrator, I ran those papers
25    through an online plagiarism checker.
```

Page 15

```
 1              Proceedings
 2         And then I used the version of
 3    Ms. Tshudy's paper already highlighted
 4    by Professor Gould, and I further
 5    highlighted her paper and the law review
 6    note with pink highlighter where I saw
 7    substantial similarities between the
 8    papers, and you've all seen my
 9    pink-highlighted version.
10         As required under Section 5.2A,
11    also on page 10, I had a phone call with
12    Ms. Tshudy on Monday, January 3, and the
13    purpose of that call was to let
14    Ms. Tshudy know that the allegation had
15    been lodged.  Professor Sabrina Sondhi,
16    also a member of the Honor Committee,
17    joined me for that call.
18         On Tuesday, January 4, Ms. Tshudy
19    provided me with further information
20    about her paper for Professor Gould's
21    class.  She included a list of sources
22    and an outline for her paper with newly
23    added annotations.  Those materials were
24    forwarded to the hearing board.  I
25    responded to Ms. Tshudy's email on
```

Page 16

```
 1              Proceedings
 2    January 4 with further information
 3    regarding my investigation into the
 4    allegations, including the
 5    pink-highlighted versions of the two
 6    papers.  In my email to Ms. Tshudy, I
 7    outlined for her the procedure for honor
 8    proceedings as provided in Chapter 5 of
 9    the honor code.
10         Professor Sondhi and I had a
11    further conversation with Ms. Tshudy on
12    Wednesday, January 5th.  Ms. Tshudy
13    reiterated that she did not believe she
14    violated the honor code because she did
15    not intend to copy someone else's work,
16    and therefore, she did not feel she
17    should enter into an agreement to
18    resolve the allegations.
19         Under Section 5.2, still on
20    page 10, if -- in the absence of an
21    agreement, the honor code administrator
22    is obligated to meet with the honor
23    committee chair to determine whether
24    there is probable cause to believe that
25    the honor code has been violated.  I
```

Page 17

```
 1              Proceedings
 2    consulted with honor committee chair
 3    ████████ on Thursday, January 6, and
 4    we concluded that probable cause exists
 5    to believe the honor code has been
 6    violated.
 7         Therefore, under Section 5.3A of
 8    the honor code, honor committee chair
 9    ████████ appointed members of the
10    hearing board, appointed
11    Professor Butler as president, scheduled
12    the time and place of hearing, notified
13    Ms. Tshudy, and gave notice to
14    Professor Gould as a witness.
15         Under Section 3.1A of the honor
16    code, which is on page 8 -- if you want
17    to turn to that.  I provided all of the
18    evidence I expect to present today to
19    Ms. Tshudy.  I recently became aware of
20    a university provided program for
21    detecting plagiarism called "Turnitin."
22    I did not know about Turnitin.  I used
23    Turnitin to compare Ms. Tshudy's paper
24    and Ms. Roger's note.  While the
25    substance of the highlighting is the
```



## Page 18

Proceedings

1
2  same as the pink-highlighted version, I
3  had said previously, these are a little
4  easier to read, and therefore it is
5  these versions I have included in your
6  package.
7        Before we move on, does anyone
8  have questions of me?
9        PROFESSOR BUTLER:  I see no
10  questions -- yes, please.
11        UNKNOWN SPEAKER:  Sorry, I just
12  want to reiterate, there was an attempt
13  to make an agreement beforehand.
14        DEAN WILLIAMS:  Yes, correct.
15        Okay.  The sections of the honor
16  code alleged to have been violated can
17  be found on page 6 of the honor code.
18  So if you want to turn to page 6,
19  page -- Section 2.1 is the violations
20  section.  So the sections alleged to be
21  violated are Section 2.1D, violating any
22  other rules of Dickinson Law or a member
23  of its faculty pertaining to the
24  administration of examinations or the
25  completion of coursework.  And

## Page 19

Proceedings

1
2  Section 2.1F, Violations of Academic
3  Integrity.
4        Violations of academic integrity
5  include, but are not limited to copying,
6  plagiarism, fabrication of information
7  or citations, facilitation of acts of
8  academic dishonesty by others,
9  unauthorized possession of examinations,
10  submitting work of another person or
11  work previously used without informing
12  the instructions -- instructor, excuse
13  me.  And tampering with the academic
14  work of other students.
15        For purposes of this hearing, the
16  important parts of Section 2.1F are
17  copying and plagiarism.  So let's turn
18  to the definition of plagiarism under
19  Section 1.112 of the honor code, which
20  is found on page 4.  We're going to
21  parse this definition of plagiarism
22  because it's pretty dense.
23        Under Section 1.112 of the honor
24  code, the definition of plagiarism is --
25  says that plagiarism should be given its

## Page 20

Proceedings

1
2  usual dictionary meanings, to steal and
3  pass off the ideas or words of another
4  as one's own, to use a created
5  production without crediting the source,
6  or to commit literary theft presenting
7  as new and original an idea or product
8  derived from an existing source.
9        Plagiarism includes the copying or
10  paraphrasing without acknowledgment of
11  any material written or expressed by
12  another person and the submission of
13  work written in whole or in substantial
14  part by someone other than the student
15  who submits the work as the student's
16  own work.
17        The definition goes on to include
18  the following:  Plagiarism also includes
19  the resubmission of work originally
20  completed for another counsel and the
21  giving or receiving of excessive
22  assistance or making excessive use of
23  the work of someone else in preparing an
24  assignment without faculty approval.
25        What constitutes "excessive

## Page 21

Proceedings

1
2  assistance" or "making excessive use of
3  the work of someone else" is a matter
4  for the course professor to decide and
5  communicate in a timely manner to the
6  students.  Unless the course professor
7  gives different instructions, excessive
8  assistance should be construed with
9  reference to the academic purpose of the
10  assignment to develop a student's
11  research and writing skills and to
12  evaluate his or her skills.
13        A student may receive some counsel
14  and suggestions from other people, for
15  example, another student, the course
16  professor, so long as the paper is in
17  both pedagogical and literary senses the
18  work of the student.
19        So at this point I'd like to call
20  Professor Gould as a witness.  So,
21  Professor Gould, will you join me?
22        Professor Gould, would you please
23  take a moment to introduce yourself.
24        PROFESSOR GOULD:  Sure.  I'm a
25  patent attorney and counsel at the




Page 22

1      Professor Gould -Direct Examination
2      RatnerPrestia Law Firm where I'm
3      co-chair of the firm's Pharmaceutical,
4      Biopharma and Life Sciences Industry
5      Group.  I've been a patent attorney for
6      over 30 years, specializing mainly in
7      pharmaceuticals and biotech.
8      Previously, I was, for a long time, in
9      house at Merck and Schering-Plough, most
10     recently as a legal director in Merck's
11     Intellectual Property Department.  I'm
12     also an adjunct professor here, as you
13     know, last term teaching biotech,
14     pharmaceuticals and the law.  Of course,
15     I also taught two years before that.
16     EXAMINATION BY
17     BY DEAN WILLIAMS:
18     Q    So, Professor Gould, I'm going to
19     put your course instructions on the screen.
20          Did you provide information to
21     your students about the requirements for
22     their final paper in your course?
23     A    Yes.  And a good example of that
24     is the course policy statement.  This is a
25     true and correct copy.  It's been posted for

Page 23

1      Professor Gould -Direct Examination
2      the class in Canvas since early October and
3      has not been revised since.  This has
4      detailed instructions on the final paper.
5      Q    And I've sent this material to all
6      of you.  You should all have this.  So will
7      you just read the details regarding the
8      instructions for the final paper?
9      A    Right.  Well, the first one is --
10     well, I call it BPL, initials of the course,
11     Biotech, Pharmaceuticals and the Law.  So
12     BPL final papers must comply with the
13     following submission and formatting
14     requirements, unless permission to deviate
15     is obtained well ahead of time.  A minimum
16     of 20 double-spaced tight pages, excluding
17     footnotes, end notes, references using
18     one-inch margins and 12-point font, and
19     approximately 5,000 words minimum, again,
20     excluding footnotes, end notes and
21     references.
22          (2), citations shall conform to
23     the Blue Book.
24          (3), students must submit an
25     original manuscript.

Page 24

1      Professor Gould -Direct Examination
2          And (4), students shall not engage
3      in plagiarism or other dishonesty or
4      deception.  Students guilty of such conduct
5      will receive a failing grade, will be denied
6      credit for the course, and will be subject
7      to other sanctions pursuant to the Dickinson
8      Law honor code.
9          And then, that's just to be
10     completed, there's more detail and more
11     instructions.
12          (5), students shall not receive
13     excessive assistance or make excessive use
14     of the work of someone else preparing a BPL
15     final paper, regardless of whether they give
16     credit to that person.
17          (6), the absolute deadline for
18     submission of BPL final papers is December
19     15, 2021.  The due date for submission of
20     the proposed topics for the final paper is
21     October 6 -- and I give liberal extensions
22     on the choice of topic, just so you know.
23     And the due date for submission of students
24     research plan for the final paper is
25     October 18th.

Page 25

1      Professor Gould -Direct Examination
2          There's more detail.  A sample
3      student paper provided by another
4      Dickinson's Law professor conforming to
5      rules above, I posted in Canvas.  A research
6      plan for your paper, around 400, 500 words
7      or so, is due Monday, October 18th.  Your
8      plan should include a clear statement of the
9      issues that you will be handling, as well as
10     your general research plan, your proposal
11     for analyzing issues in your thesis.
12          You will present your paper at one
13     of the last two class sessions -- and I
14     detail on that if you need.  The absolute
15     deadline for your final paper will be
16     December 15, 2021, and your final paper must
17     be sent directly to me by email, my email,
18     by 11:59 p.m. on that date.
19     Q    So when Ms. Tshudy turned in her
20     paper, what led you to suspect that her
21     paper may not have been entirely her own
22     work?
23     A    I found the note in Law Review
24     that you referred to earlier by Hannah-Alise
25     Rogers very quickly on the Internet.  And it



Page 26

1      Professor Gould -Direct Examination
2   was when I opened it up and started reading
3   the note and going through it, I recognized
4   substantial similarity to large parts of
5   Ms. Tshudy's paper.
6      Q    And again, how did you find that
7   published Law Review note?
8      A    Right.  Well, the short answer is
9   a quick Google search.  I should elaborate.
10     Q    Yes, if you would.
11     A    Ms. Tshudy's final paper focused
12  on a 2012 case Momenta, and you actually
13  mentioned the case in the title of
14  Ms. Roger's note.  And Ms. Tshudy's paper
15  focused on that case, which was a patent
16  case, to advocate a strategy of relying on
17  trade secret protection rather than patent
18  protection for testing methods, testing the
19  (inaudible) that will be submitted to the
20  FDA.
21          In what I've read in discussions,
22  in Scholarship, I couldn't recall that
23  strategy based on the Momenta case, and I
24  was also curious because I was concerned
25  about what would happen if you preserve this

Page 27

1      Professor Gould -Direct Examination
2   trade secret instead of patenting it.  What
3   would happen if FDA wanted to use that
4   testing method and disclose it, and then
5   that would ruin the trade secret.
6          So I was looking into -- not
7   recalling that, I literally opened a Google
8   search, to be specific.  And I remember --
9   because this was very recently -- I put in
10  just three words.  I put in "Momenta trade
11  secret."  And the very first hit was
12  Ms. Rogers' note in the Georgia Law Review.
13  So I clicked on it, I recognized -- the
14  title itself was right on point.  I'll show
15  you.
16     Q    Should I -- what would you like me
17  to open?
18     A    Oh, I guess we could do that.  One
19  thing is sort of just to go back and forth,
20  I guess.  I guess, start with the --
21  Ms. Roger's note in the Law Review and go to
22  the first page.
23          I mean, literally, this is sort of
24  what happened and how I saw it.  So I saw
25  the title, which was right on point, you

Page 28

1      Professor Gould -Direct Examination
2   know, focused on Momenta case and protecting
3   equivalency testing.  I should mention, the
4   Momenta case was all about bioequivalency
5   testing for submission to FDA and patent
6   protection, nothing about trade secrets --
7   and then you go down the first page.
8          So I started reading it -- and you
9   can stop there.  I started reading it and
10  the first couple of sentences looked really
11  familiar.  And at this point, I pulled up
12  Ms. Tshudy's paper and -- yeah, so go to
13  that.
14          This should fall -- literally how
15  it went.  And I saw, as you can see, there's
16  a lot word-for-word or very closely
17  paraphrased.  And then I started going
18  through the note in Law Review alongside
19  with Ms. Tshudy's paper and started seeing a
20  lot of similarities in a couple of ways.
21          Maybe -- if you could scroll
22  through Ms. Tshudy's paper.
23          So I'm looking at the two
24  side-by-side.  So if you scroll through
25  especially I saw those sentences.  And then

Page 29

1      Professor Gould -Direct Examination
2   for a while, nothing I recognized in the
3   note because a lot of this was the patent
4   section.  And then I started seeing certain
5   keywords, but it -- go down a little more to
6   see -- do it more expeditiously.  A lot of
7   this starts at around pages 7, 8, 9.
8      Q    And, I'm sorry, this doesn't
9   have -- this is page 9, right?
10     A    This was submitted without page
11  numbers.
12     Q    Yeah, without page numbers.  So
13  this is page 9.
14     A    Sorry.  Do you have to add two?
15     Q    Because of the -- yeah, maybe I
16  do.
17     A    Yeah, you have to add two.
18     Q    Okay.  So -- I'm sorry.  Can you
19  just give me a --
20     A    Oh, sure.
21     Q    Tell me where you want me to go.
22     A    Well, that's where a lot of the --
23  there are a couple of things that stood out
24  to me.  One, as I went through them, I was
25  seeing a lot that looked really similar and

8 (Pages 26 to 29)




```
 1        Professor Gould -Direct Examination
 2   just go through it.  And again, as you know,
 3   what you're looking at is the Turnitin
 4   program that did this highlighting.  But I
 5   could see a lot of this -- and scroll down
 6   some more.
 7        At first when it gives you an
 8   overview, especially when you get to the
 9   analysis and cases section.  Yeah, so I also
10   started seeing a lot of the same cases, what
11   looked like the same basic order, largely, a
12   lot of similar quotations.  So if you --
13   scrolling down.  I just want to give you a
14   general idea of how I was going through and
15   seeing a lot of similarity just in the bulk
16   and a lot of copying.  And, again, this was
17   highlighted by the program later, but I saw
18   a lot of those.
19        And then another thing I did, I
20   started seeing certain unusual words or
21   wording when I was reading the note in Law
22   Review.  And I think -- you want me to go
23   through some examples of that?
24      Q    Yeah, I think that would probably
25   be helpful.
```

```
 1        Professor Gould -Direct Examination
 2      A    But there were certain key phrases
 3   and wording as I was reading the note in the
 4   Law Review, it was like, oh my gosh, I've
 5   seen this before.  And so it wasn't just the
 6   sort of look of what seems to be substantial
 7   copying and bulk, if you will.  But then I
 8   started seeing certain key phrases and words
 9   that I recognized and compared it, and was
10   finding passages with quite a lot with
11   word-for-word copying and some passages
12   where it was mostly word-for-word, but then
13   there were some slight changes, so it was
14   closely paraphrased the rest of it.
15        So there are a lot of examples of
16   that where it's mostly word to
17   word-for-word, and then maybe parts of it
18   will be closely paraphrased with changing
19   some of the words.  So I started seeing
20   that.
21        And then let me pause here.  Do
22   you want me to say what I did next?
23      Q    No.  Actually, I'd like you to
24   talk a little bit about the structure of
25   Ms. Tshudy's paper and whether you noticed
```

```
 1        Professor Gould -Direct Examination
 2   similarities in the structure of
 3   Ms. Tshudy's paper compared to the structure
 4   of Ms. Rogers' Law Review note.
 5      A    Okay.  On the structure
 6   Ms. Tshudy's paper broadly, sort of, had two
 7   parts.  It had, sort of, the patent part,
 8   questioning the value of patents, and really
 9   that was focused on the Momenta case where
10   the Federal Circuit found in that case, in
11   the 2012 Momenta case, a Safe Harbor
12   exemption, if you will, for infringement of
13   a patent that related for testing.  Testing
14   methods that will be submitted to the FDA.
15        And I think it's fair to say both
16   the note and Ms. Tshudy's paper put a lot of
17   emphasis on the Momenta case to start
18   building and advocating the strategy of
19   relying maybe more on trade secret
20   protection than patent protection.  And
21   then, just structurally, the next part of
22   Ms. Tshudy's paper, which is more than half,
23   but, sort of, the second half of the second
24   part, was then analyzing under the strategy,
25   assessing potential risks.
```

```
 1        Professor Gould -Direct Examination
 2        And if I remember correctly, the
 3   risk she was looking at was first the risk
 4   of Freedom of Information Act, or FOIA,
 5   requests that could result in possibly in
 6   revealing the trade secret.  Ms. Tshudy
 7   briefly touched on, very briefly, I think,
 8   the possibility of FDA use and FDA's
 9   disclosure of the testing method supposed to
10   be kept a trade secret.  Then, if I remember
11   correctly, sort of, litigation risks under
12   the right of public access, you know,
13   especially in court judicial documents.
14        And then Ms. Tshudy's paper, the
15   last part of that, sort of, risk analysis
16   was subpoenas.  And if I recall correctly,
17   that largely tracked the -- Ms. Rogers note
18   in the Georgia Law Review.  And my
19   recollection is roughly in the same order.
20   That's the structure.
21        And then at some point you may
22   want me to go through specific examples,
23   words and phrasing.
24      Q    Yeah, why don't we do that.
25      A    And then I could talk at some
```



Page 34

Professor Gould -Direct Examination
1
2    point about the overall thesis of each
3    paper.
4        Q    Go ahead.  Tell me where you would
5    like me to go.
6        A    Right.  We did page one first.
7    There's a lot we can go through, but I'm
8    going to give quite a number of examples.
9    And I guess anyone can ask if they want more
10   examples, but --
11       Just to focus on some examples,
12   this is where I'm seeing, sort of, unusual
13   or special words and phrases, you know, that
14   I recognized back and forth.  So here on
15   page 4, may have to add -- she's going by
16   that -- it may be page 6.  Here's one, right
17   there, near the bottom where it says to
18   read -- not the very bottom, just above
19   that, where it says, Safe Harbor Provision
20   of the Hatch-Waxman Act.  So Safe Harbor,
21   the provision of the Hatch-Waxman Act.
22   Again, the program Turnitin program.  I
23   think my understanding is it strictly does
24   word-for-word.
25       Q    Yeah, I mean, it looks for --

Page 35

Professor Gould -Direct Examination
1
2        A    Right.  It doesn't start
3    highlighting close paraphrasing.
4        Q    Close paraphrasing, no.
5        A    So Safe Harbor Provision of the
6    Hatch-Waxman Act allows competing drug
7    manufacturers.  I recognized the word borrow
8    in quotes, and it's in quotes also in
9    Ms. Rogers note in Law Review.  She, I'm
10   sure, meant it not as a quotation of the
11   case, but as sort of a colloquial phrase.
12       Q    If you just give me a second.
13       A    Sure.
14       Q    It should be on this page.
15       A    Yeah, you had it.  Sorry.  You're
16   going to the note now?
17       Q    Yeah, this is the note right here.
18   The Safe Harbor Hatch-Waxman Act allows
19   competing drug management -- this is the
20   note.  This is the Law Review note.
21       A    Right.  The published note.
22       Q    This is the published Law Review
23   note.
24       A    And there you'll see reference to
25   borrow, also in quotes.

Page 36

Professor Gould -Direct Examination
1
2        Q    There it is in the Law Review
3    note.
4        A    And then I'm just going to go to
5    the next highlighted sentence after that.
6    I'm going to try and do this in page order.
7    So let's see -- and go down to the next
8    highlight.  There we go.
9        Federal circuits, holding, and
10   Momenta threatens manufacturers -- on Ms.
11   Tshudy's paper, it says, of generics --
12   well, you'll see in a second what Ms. Tshudy
13   substituted for the (inaudible) note.  But I
14   recognized, a devastating loss of previously
15   available patent protection for -- and
16   again, some change in the wording.
17       And here is an example,
18   devastating loss, I found pretty readily --
19   I have to find it here.  Yeah, there's
20   Federal circuits holding, and Momenta
21   threatens manufacturers with a devastating
22   loss of previously available patent
23   protection.
24       And some of these I just saw and
25   recognized.  I also did some control F finds

Page 37

Professor Gould -Direct Examination
1
2    and found some things that way.  But again,
3    as you mentioned, one reason I also looked
4    for very precise and unusual or special
5    wording as sort of a fingerprint, because
6    the Turnitin program will show extensive
7    copying of summaries of the cases and
8    quotes -- quotations.
9        But I wanted to also show that a
10   lot of this was not just summarizing cases
11   or quoting, but this was sort of what I
12   would call "analytical passages" and special
13   words.
14       Okay.  And let's see another one.
15   Let's go to page 7, which I guess might come
16   up as 9.  This is something I saw early on,
17   just so you're following -- another thing
18   that really got my attention, besides the
19   first two sentences, this is a phrase,
20   "hungry eyes."  Manufacture -- well,
21   fortunately a solution exists for generic
22   drug manufacturers who wish to shield their
23   tests and methods from the hungry eyes of
24   their competitors.
25       And then the rest.  Despite





Page 38

```
1        Professor Gould -Direct Examination
2    numerous regulations governing disclosure of
3    information submitted, the FDA, including
4    most notably the Freedom of Information Act,
5    generic drug manufacturers using a
6    heightened degree of care can protect -- and
7    then I think -- well, we'll see in a second.
8    I think there's some paraphrasing here that,
9    of course, the Turnitin program doesn't pick
10   up.
11        And I think it's sort of been said
12   already, but just so we're clear.  During
13   the inquiry and investigation, you know,
14   when I did the yellow highlighting.  I don't
15   know if I mentioned this.  What happened, I
16   found this the evening of December 30 and
17   started going through this.  And what I did
18   is, actually, I called Dean Dodge and he
19   said to contact Dean Williams; this is the
20   proper procedure.
21        And it was getting towards
22   midnight -- that's why, as you correctly
23   mentioned, you received my email on the
24   31st.  It was like probably 1:00 in the
25   morning or something.  But to give you an
```

Page 39

```
1        Professor Gould -Direct Examination
2    idea, I wanted to get this out.  So I
3    highlighted a few examples very quickly and
4    sent an email, something like, I haven't
5    checked this against a plagiarism program or
6    anything, and it didn't -- so one thing I
7    wanted to mention, in the yellow
8    highlighting, and I think the pink also,
9    there's some of this that included not only
10   the exact word-for-word, but also some close
11   paraphrasing.
12        I like the way that we're looking
13   at this because it's clear and it's most
14   conservative because it's literally only
15   word-for-word.  I even found some things
16   that are -- I don't know if it's four or
17   five words in a row or something, it doesn't
18   pick up.  So I just wanted to clarify that.
19        There's the hungry eyes.  When I
20   saw that -- I don't know if I even put that
21   in the law review phrase -- that sort of
22   struck me.  Okay.  And there's a lot more
23   but -- if I'm going too fast or jumping
24   ahead.  But let's go to page 11.
25        Did we show the hungry eyes?
```

Page 40

```
1        Professor Gould -Direct Examination
2    Q    Yeah, we just showed the hungry
3    eyes.
4    A    In the notes?
5    Q    Yeah, I did both places.
6    A    Yeah.  I'm losing track of them.
7    Q    That's okay. So -- I'm sorry, page
8    11 --
9    A    In Ms. Tshudy's, which would be
10   probably 13 -- out of 28.
11   Q    This one?
12   A    Yeah.
13   Q    Okay.
14   A    And what you're starting to see,
15   if you have the document in front of you,
16   there's heavy highlighting by the Turnitin
17   program all through here.  But just, without
18   going through all of it, and some of it is
19   quotations, but in the middle paragraph.  In
20   addition, a couple of things about this
21   paragraph.  First of all, this is literally
22   a whole paragraph, word-for-word.  It's not
23   a case summary or quotation.
24        It's analytical in nature and
25   original with Ms. Rogers and then certain
```

Page 41

```
1        Professor Gould -Direct Examination
2    words like -- in the -- near the end,
3    manufacturers and producers -- of the three
4    lines from the bottom of that paragraph,
5    producers of lucrative goods would hesitate
6    to turn to the courts for a remedy if the
7    court would simply dispose of trade secrets
8    to the first person who asks -- that's okay.
9    I mean, little colloquial, but my point is
10   these are some of the signatures that I was
11   able to identify in both.
12        Oh, and go to the note, please.
13   Q    It's this paragraph.
14   A    Yeah, there it is.  Word-for-word
15   with the conservative Turnitin program.
16        Next I would go to page 12 of
17   Ms. Tshudy's paper and around the middle --
18   so you're in the right paragraph.  Just the
19   next set of high value.  Yes, there.
20        So in the set of highlighting
21   that's sort of in the middle of the screen.
22   Q    This part right here?
23   A    Yeah.  Thanks.
24        If public disclosure via the
25   common law right of public access -- and
```



Page 42

```
 1        Professor Gould -Direct Examination
 2   then I'm just going to read the literal
 3   work, the word-for-word wording.  Causes
 4   generic manufacturer to lose its competitive
 5   advantage as well as the millions of dollars
 6   invested in development of the secret.  The
 7   presumption, which favored disclosure, has
 8   demonstrated Momenta -- and, you know, some
 9   paraphrasing, changing the words -- offer a
10   competitive advantage to generic companies
11   who develop them.
12        So somewhat unique wording.  But I
13   also mentioned about structure.  Here we're
14   in the common law, right of public access
15   aspect of the structure.  And also it shows
16   the -- it's also analytical in nature, not
17   just a quote or something from a case.  And
18   then it also shows the importance of the
19   Momenta case in both the -- Ms. Roger's note
20   and Ms. Tshudy's paper.
21        Q    So if I go here --
22        A    Then you have to find it.
23        I didn't give my specific
24   selections ahead of the time to Dean
25   Williams.  Sorry.
```

Page 43

```
 1        Professor Gould -Direct Examination
 2        Q    It's okay.
 3        Yeah, it's this part here.
 4        If a public disclosure, being a
 5   common law right of public access, causes --
 6   go ahead.
 7        A    Yeah.  Causes the generic
 8   manufacturer to lose competitive advantage,
 9   as well as the millions of dollars invested
10   in development of the secret, the resumption
11   would favor disclosure, as demonstrated in
12   Momenta.
13        And notice the change, I think
14   frequently -- a lot in Ms. Tshudy's paper,
15   she changed "bioequivalency test" to take
16   out the word bioequivalency, and it said
17   things like testing method or test method.
18   The Momenta case was all about
19   bioequivalency testing -- just so you have
20   context -- to offer a competitive advantage.
21   So it shows the emphasis on the Momenta case
22   and another analytical passage.
23        Q    So let's just go back to this.
24        A    Oh, thank you.
25        Q    So it's the same language.
```

Page 44

```
 1        Professor Gould -Direct Examination
 2        A    Yeah.
 3        Q    It's the same concept presented.
 4        A    And some close paraphrasing that
 5   the Turnitin program doesn't pick up.  Okay.
 6   Only a few more that I've highlighted -- I
 7   wonder if I should jump to the conclusion,
 8   but -- let's go to -- let's jump a little
 9   bit.
10        I definitely will get to the
11   conclusion, but --
12        Q    Okay.  Go ahead.  No, no.  Go
13   ahead.
14        A    Should I give them some more
15   examples of the fingerprint?
16        Q    I believe.
17        A    Yeah, just a couple more of those
18   and then the conclusion, I think is valuable
19   for everyone to see.
20        Page 18 of Ms. Tshudy's paper.
21        Q    All right, let me find that.
22        The wider social consequences --
23   is that where you are?  Is that the first
24   word at the top of the page?
25        A    Oh, yes.
```

Page 45

```
 1        Professor Gould -Direct Examination
 2        Q    Okay.
 3        A    You can almost talk about that.
 4   But what I was going to focus on is sort of
 5   in the middle.  Go down a little more there.
 6        Oh, they have a chilling effect.
 7   And so manufacturers disclose trade
 8   secrets -- and then -- have a chilling
 9   effect.  I mean, people use that phrase, but
10   it sort of stuck out -- on beneficial,
11   effective research.  And then phrase like
12   wider social impact would weigh in favor of
13   suppressing the subpoena.
14        Q    So can you read that whole
15   sentence.
16        A    In Ms. Tshudy's paper, in
17   addition, requiring biotech manufacturers to
18   disclose trade secrets would not only have a
19   chilling effect on beneficial scientific
20   research and disincentivizing the
21   investment, but could also have a much wider
22   social impact that would weigh in favor of
23   suppressing the subpoena.
24        So, again, there are changes
25   within these, but I'm sort of focusing on
```




Page 46

1      Professor Gould -Direct Examination
2   the -- wider social impact and the chilling
3   effect.
4      Q    Okay.  And is that a quote from
5   another case, or is that a conclusion drawn?
6   That's a conclusion drawn, right?
7      So let's look at the Law Review.
8      A    Yeah.  I think it's analytical.  I
9   definitely don't recall that from a case.
10  There's a lot of cases in this area, but I
11  took that to be analytical by Ms. Rogers but
12  if someone's aware -- somewhere in the case,
13  let me know.
14     Q    So read this sentence, starting,
15  In addition.
16     A    Yes.  From the note, In addition,
17  the consideration of wider social impact
18  would weigh -- I guess it's -- in favor of
19  suppressing a subpoena, because requiring
20  generic drug manufacturers to disclose trade
21  secrets could have a chilling effect on
22  beneficial scientific research.  So some
23  paraphrasing and changes, but signature
24  words.
25     Q    And that is a conclusion.

Page 47

1      Professor Gould -Direct Examination
2      A    It's analytical and a conclusion
3   and not something I recognize any of the
4   cases, but I don't have them all memorized.
5      Q    Okay.
6      A    And then just one more before we
7   get to the conclusion itself.
8      On page 19 of Ms. Tshudy's paper,
9   I want to focus on that.  Keep it right
10  there, the highlighted phrase.  It's up
11  close to the top, where it says, constitutes
12  a trade secret.  The threat of disclosure by
13  the FDA is manageable.  I just want to focus
14  on the word "manageable."  Not an unusual
15  word, but it's an important conclusion, very
16  important conclusion.  And not only my view,
17  not only Ms. Tshudy's paper, but if you turn
18  to the note, you'll see Ms. Rogers also uses
19  the word "manageable" as a conclusion.
20      And this would be -- it's getting
21  a little probably late.  Do you want to --
22     Q    Can you tell me where to look for
23  this?  Oh, right, here it is.  This
24  information, so long as a generic
25  manufacturer treats the bioequivalency test

Page 48

1      Professor Gould -Direct Examination
2   as a trade secret, the threat of disclosure
3   by the FDA is manageable.
4      A    Yeah, and I know it's only a sort
5   of a short phrase, but manageable is very
6   important as a conclusion.  One of the
7   underlying conclusions of Ms. Tshudy's paper
8   and Ms. Roger's note.
9      And then that leads to the
10  conclusion, I think.  We'll go to Ms.
11  Tshudy's conclusion and starts on page 19.
12     A couple of things about the
13  conclusion, a good deal of that is
14  word-for-word, even though there's also
15  close paraphrasing within there -- and I'm
16  going to come back this, but just go down
17  for a second to the rest of the conclusion
18  just so people can see the highlighting.
19  And, you know, in analyzing this further.
20  Obviously, I did more analysis beyond what I
21  saw that night -- but on the conclusion,
22  it's significant in my view that a lot of
23  the conclusion is word-for-word.
24     And just go back to the previous
25  page.

Page 49

1      Professor Gould -Direct Examination
2      There's a very key conclusion
3   here.  You can almost sum this up as a key
4   conclusion on both Ms. Tshudy's paper and
5   Ms. Rogers' notes.  You see the phrase, A
6   viable alternative to patent protection.
7   It's the penultimate line there.  I mean,
8   that's a major conclusion for both the paper
9   and the note because, again, the strategy
10  here, keying off the Momenta case in both
11  papers, is -- the strategy is to rely on
12  trade secret rather than patents.
13     And then the second part of both
14  papers is to look at risks, potential risks.
15  And so that's a big conclusion, to go
16  through several areas of potential risk and
17  then to come up with the conclusion that
18  it's okay.  In other words, it's a viable --
19  they're both talking about trade secret
20  protection over patents being a viable
21  alternative patent protection.  And so
22  that's only seven words, but that really
23  struck me because that's a very important
24  inclusion in the same words.
25     And then if you go down still --



<table>
</table>

Page 50

```
 1        Professor Gould -Direct Examination
 2    yeah, again, a lot of similarity.  There's
 3    even a bit that the Turnitin program did not
 4    pick up, but that's okay.  And look at --
 5    because you're going through the different
 6    possible risks.  And the third risk there is
 7    largely word by word, as you can see.
 8        And then what I want to point to
 9    is, again, the final conclusion, A viable
10    and -- Ms. Tshudy put in the word
11    "unstable" -- but you see again, Viable
12    alternative to patent protection.  So, one
13    thing, just having looked at that, this is
14    what I mean when I say that a major theme in
15    Ms. Tshudy's paper is focusing on the
16    Momenta case to advocate for a strategy of
17    relying on trade secret protection over
18    patent protection and then looking at the
19    various risks to ultimately conclude that
20    it's okay.  In other words, it's a viable
21    alternative to patent protection.  The high
22    level of matching or tracking from
23    Ms. Tshudy's theme here and the fundamental
24    thesis of Ms. Roger's note in the Georgia
25    Law Review.
```

Page 51

```
 1        Professor Gould -Direct Examination
 2    Q    Okay.
 3    A    If you want to go through other
 4    parts -- oh, we should find it.  Sorry.
 5    Q    Just look at it here.
 6    A    That's the notes.  There's the
 7    sentence about, Third generic manufacturers,
 8    right.  There's the hungry eyes, again,
 9    although that phrase is not in Ms. Tshudy's
10    conclusion.  And maybe you go up to find the
11    word "viable alternative."  You might go up
12    a little bit in the note -- exactly where
13    that was.
14    Q    I don't know what happens if I try
15    to do a control f.
16    A    That's one way.
17    Q    No, I don't think it's going to
18    take it.  Maybe it will.
19    A    Another way to do it is to go back
20    to your pink highlighting.
21    Q    I'm not sure.  Let me look.  I
22    have it on page 244.
23    A    Well, at the very end of the note,
24    it talks about an alternative to patent
25    objection for manufacturers.  But the word
```

Page 52

```
 1        Professor Gould -Direct Examination
 2    "viable" was obviously in there because the
 3    program found it.
 4        UNKNOWN SPEAKER:  I did find it,
 5    if you would like.
 6        DEAN WILLIAMS:  Yes.  Can you tell
 7    me where it is?
 8        UNKNOWN SPEAKER:  It's on page
 9    244, in the first paragraph under the
10    conclusion, about a third of the way
11    through that paragraph, the sentence
12    starts --
13        DEAN WILLIAMS:  Oh, right here.
14        UNKNOWN SPEAKER:  -- this note has
15    demonstrated.
16        DEAN WILLIAMS:  Thank you.  Right
17    here, This note has demonstrated --
18    anyway --
19        This note has demonstrated that
20    trade keepers law can provide a viable
21    alternative to patent protection for
22    generic manufacturers.
23        PROFESSOR GOULD:  Yeah, that's
24    interesting, so it looks like the
25    program picked it up in one paper, but
```

Page 53

```
 1        Professor Gould -Direct Examination
 2    not in the other.  There it is.  Thank
 3    you.
 4    BY DEAN WILLIAMS:
 5    Q    Professor Gould, do you have
 6    anything else to add?
 7    A    I would just go over the
 8    timetable, give you a picture of the run of
 9    the semester.  As I mentioned, the policy
10    document with the detailed instruction was
11    posted in Canvas in early August before the
12    first day of classes and, again, in Canvas
13    and remained there unrevised.  And then the
14    students chose -- each student chose his or
15    her own topic, and Ms. Tshudy selected this
16    topic for herself.
17        I thought it's a good topic, by
18    the way.  The discussions I have with
19    Ms. Tshudy focused more on trade secrets,
20    protecting manufacturing processes,
21    especially the processes on how you make or
22    how you prepare these biomolecules, the
23    actual biologic or monoclonal antibody or
24    biopharmaceutical -- that recollection of a
25    lot of our discussions, that's why --
```

MAGNA
LEGAL SERVICES

Page 54

```
 1        Professor Gould -Direct Examination
 2    another thing, it was interesting to me that
 3    the shift in focus to testing.
 4            We had phone conferences, I do
 5    that with all the students.  We have phone
 6    conferences, and I invite them to have as
 7    many as they want, really.  Ms. Tshudy and I
 8    had phone conferences on October 15th and
 9    another one on November 5th -- and also,
10    Ms. Tshudy presented her paper briefly, like
11    all the students in class last week of
12    classes -- and then again, the telephone
13    conferences, October 15th, November 5th.
14    And I was clear that she could contact me if
15    she wanted additional phone calls or any
16    concerns.
17            And from November 5th all the way
18    through her sending in the paper on
19    December 17th, MS. Tshudy never contacted me
20    again to have a phone call, nor did she
21    express any concerns.  And then I got the
22    paper on December 17th.
23     Q    I'm sorry.  Say that again.  You
24    got the paper when?
25     A    December 17th.
```

Page 55

```
 1        Professor Gould -Direct Examination
 2     Q    And when was it due?
 3     A    It was due the 15th.
 4     Q    Okay.
 5     A    Ms. Tshudy -- I didn't get any
 6    notification, but when it arrived -- I sent
 7    a reminder, it arrived via email late on the
 8    17th with some explanations and comments on
 9    some trouble she had.  I'll leave it to
10    Ms. Tshudy because it's personal in nature,
11    so I'll leave that to her.
12     Q    In her class presentation, did she
13    focus on the Momenta case during her class
14    presentation?
15     A    No.  And I'm pretty sure she
16    didn't even mention it.  A lot of her
17    presentation in class, I remember, was
18    focused on the second part of her paper and
19    Ms. Roger's paper, the risks of the strategy
20    in terms of things like Freedom of
21    Information Act requests, a member of her
22    presentation in class -- these are just
23    brief five to ten minutes presentations.
24            My view is the students, after
25    having worked on all this and spent so much
```

Page 56

```
 1        Professor Gould -Direct Examination
 2    time and effort working on this, it's sort
 3    of nice for them to, sort of, present it,
 4    especially to people beyond me.  And I don't
 5    remember, certainly, any focus on the
 6    Momenta case.  I don't remember any mention
 7    of it.  I remember a lot of focus on
 8    litigation and the risks, possible risks and
 9    litigation, that kind of thing.  The second
10    part of Ms. Tshudy's paper is what I
11    remember.
12            DEAN WILLIAMS:  Professor Butler,
13    I have no more questions at this time,
14    although I may have further questions
15    after Ms. Tshudy and the hearing board
16    question Professor Gould.
17            PROFESSOR BUTLER:  All right.
18    Let's turn next to Ms. Tshudy and ask if
19    she has any questions for us.
20            MS. TSHUDY:  And this is the only
21    time that I was able to ask him
22    questions; is that correct?
23            DEAN WILLIAMS:  Yes, I believe so.
24    I think that's the way the hearing is
25    constructed.
```

Page 57

```
 1     PROFESSOR GOULD - CROSS-EXAMINATION
 2        PROFESSOR BUTLER:  That's right.
 3        MS. TSHUDY:  Okay.
 4        PROFESSOR BUTLER:  Do you have
 5    some questions?
 6        MS. TSHUDY:  Yeah.
 7        PROFESSOR GOULD:  Okay.
 8    CROSS-EXAMINATION
 9    BY MS. TSHUDY:
10     Q    On our meeting on October 15th, do
11    you remember the corrections or critiques
12    that you gave for my paper -- or for, like,
13    my outline?
14     A    Mean, honestly, that far back, I
15    don't remember a lot of detail.  I seem to
16    remember discussions of trade secrets and
17    manufacturing processes, because that's
18    where I see a lot of the discussion about.
19    What I usually do with students on these
20    calls is try to give some advice.  Often
21    students start having so many findings, so
22    many issues and so many things to discuss.
23    So I try and give some guidance when
24    students have to make decisions because it's
25    only a 20-page paper.  I've had that
```



Page 58

PROFESSOR GOULD - CROSS-EXAMINATION
1    discussion really with every student, but I
2    don't remember that much about the October
3    call.
4        Q     Did Dean Williams share with you
5    what I presented to her about that
6    October 16 call at all?  Did she talk to you
7    about that?
8        A     I think I did see an email, and I
9    saw some comments that I disagreed with.
10   There was something alleging that I
11   commandeered your topic, or something about
12   that.
13       If you want to pull up --
14       Q     If you like, I actually have
15   copies of those documents.
16       Okay.  Let me hand those out to
17   everybody.
18       A     There's a lot of different topics
19   covered here, but --
20       DEAN WILLIAMS:  Is there a
21   question that you have, Ms. Tshudy?
22       MS. TSHUDY:  No.  I was just
23   hoping, like -- obviously I want his,
24   you know, testimony to align, so I

Page 59

PROFESSOR GOULD - CROSS-EXAMINATION
1    didn't know if he remembered really,
2    like, what we discussed.  Because
3    obviously, like, I put it -- so when I
4    did have -- I don't want to testify
5    right now.  But when I did have that
6    meeting, I was able to, like, he could
7    see my adjustments, make my notations of
8    exactly what he was advising me directly
9    on my paper.  And he mentioned it and
10   stuff.  And so some of what is on my
11   outline is actually directly what he
12   recommended and specified.
13       So that was it.  I was just trying
14   to see if he remembered any of that
15   because it was kind of somewhat
16   memorable.
17       PROFESSOR GOULD:  I didn't see any
18   of those annotations, you know, during
19   the course of the semester.
20       I would say a couple of things,
21   one, was -- concerned that Ms. Tshudy,
22   sort of, wondered here whether my
23   concern was that she had written up for
24   one of her class assignments -- being

Page 60

PROFESSOR GOULD - CROSS-EXAMINATION
1    remote, Ms. Tshudy would write a brief
2    reflection.  And she was concerned
3    that -- one of her reflection notes
4    discussed a couple of cases that she
5    discussed in her paper and she expressed
6    some concern that it was my concern,
7    that she was, sort of, double using
8    that.  And that was not my concern at
9    all.
10       And then -- I'm not going to go
11   through this whole thing, but some
12   things that I disagreed with, some
13   strong language that Professor Gould
14   really commandeered my topic selection
15   into one that I had no idea was written
16   about so extensively and
17   comprehensively.  I don't remember that,
18   and I think that's incorrect.
19       And will I also note, again, that
20   we talked about this on November 5th in
21   a teleconference and I know I made
22   clear, as I do with all my students,
23   that they can contact me to have other
24   calls.  And again, from November 5th all

Page 61

PROFESSOR GOULD - CROSS-EXAMINATION
1    the way until when the sheet the paper
2    in on December 17, I never heard back
3    from her to ask for another phone call,
4    nor did I hear her express any concerns
5    about her project again, despite making
6    clear that I was available.
7        That's all I'll say for now
8    without going into more detail.
9    BY MS. TSHUDY:
10       Q     Just to specify, you're saying
11   that at the bottom of page 4 --
12       A     Page which?
13       Q     The bottom of page 4.
14       A     Of your paper?
15       Q     Oh, of the package she just
16   handed -- I just figured it made it easier
17   just to put it right on there.
18       A     Bottom of page 4.
19       Q     Where it says --
20       A     It's not numbered, but go ahead.
21       Q     Well, at the bottom it says --
22   yeah, sorry, I counted.
23       It says Section 3, trade secret
24   law and the potential threats of disclosure.

