<s>
</s>
<s>
</s>
<s>
</s>
<s>
</s>

Page 62

PROFESSOR GOULD - CROSS-EXAMINATION
Do you see that?
 A    No, not yet. Again, it's not numbered, but --
        UNKNOWN SPEAKER: I'm sorry, what --
        DEAN WILLIAMS: I'm not sure where you are.
 Q    I just counted the pages. I think I counted one, two, three.
        UNKNOWN SPEAKER: Is it the red highlighting.
        MS. TSHUDY: No. It's at the very bottom and there's Roman Numeral 3, right there.
        UNKNOWN SPEAKER: Roman Numeral 3.
        PROFESSOR GOULD: Oh, I see.
        DEAN WILLIAMS: I think I actually have this, so hold on one second. Maybe it will be easier if I do it this way.
        And Ms. Tshudy, you can show me if I'm looking at the right thing. Right there? Trade Secret -- there you go.
        MS. TSHUDY: Yeah. So originally -- this is actually an

Page 63

PROFESSOR GOULD - CROSS-EXAMINATION
accident, but I had sent my, like, outline, kind of, basis of what I was doing to Professor Gould -- and somehow it was actually, like, the form where you can edit it and he can see it and so we actually had this conversation about how that's really cool. But so this was -- so what I had written was just the topic and all the notes afterwards were exactly what he was speaking about. And that was actually what nearly all of our discussion was on.
        So I didn't come up with any of those discovery issues or any of that in my outline. That was all stuff that -- I'm not saying this is a bad thing -- he just seemed super fascinated on and he said that that would be, like, overly emphasized. And I'm the kind of person that if I hear a professor, you know, really advocate for that, that will, like, make me change my topic, if that's really what's going to interest him. And your kind of wondering what

Page 64

PROFESSOR GOULD - CROSS-EXAMINATION
professors would think of it.
BY MS. TSHUDY:
 Q    But, Professor Gould, my question for you is: Do you not remember that at all? Because I literally took the notes and you're, like, Oh, I can see you editing it right here.
 A    Yeah.
 Q    And it was, like, cool.
 A    Yeah. I don't remember these notes. And I don't know how much was written during the call and how much after. Obviously, it's not my control.
        What I do remember is I remember discussing what I thought was very interesting, focusing on manufacturing processes and making the biomolecules. And I recall that you had, I think, an undergrad in biochemistry, so I thought that was particularly good -- again, it was a topic Ms. Tshudy chose, but I thought it was a particularly good topic for biochemistry major.
        And I do recall, on our calls, and

Page 65

PROFESSOR GOULD - CROSS-EXAMINATION
you spoke about it a lot in your presentation, was the risks when you have the strategy of relying on trade secret protection, the risks in litigation. And I remember, at a couple of points, which call or class -- talking about how in litigation, they often have protective orders to allow for trade secret information to come in but not be available to the public. These are some of the key things I remember from our discussions.
 Q    Did you look into searching, like, any other documents or anything for any of the things you're suspicious of? Did you do a Google search or LexusNexus search or Lex Law search or any of that for anything or was it just you found this paper and you just noted particular similarities?
 A    Just to clarify, I did the searching, sort of, out of curiosity, and because one thing I was concerned about in the strategy is, what would FDA do? And so this was a curiosity -- although pertaining to your paper, I had not yet suspected any

17 (Pages 62 to 65)



Page 66

PROFESSOR GOULD - CROSS-EXAMINATION
copying. Is that your question?
    Q   Yes -- well, no. Even after you suspected it, though, like, did you check to see if other papers also said, like, the same thing? Does that make sense?
        Like, especially when it comes to unique wording or something like that? Did you do a search to check cases and other papers and stuff -- or even, like, the stuff that you felt were unique conclusions? Did you do a search to see if that's a unique conclusion or was it just --
    A   I don't recall.
    Q   -- something you hadn't experienced before -- sorry.
    A   Once I saw Ms. Roger's papers and saw the similarities and the copying, I don't recall doing additional searches to see if others use distinct wording like "hungry eyes" and conclusions like that. I don't recall doing that.
    Q   Do you recall in our last phone conversation that the only real question I had was clarifying if we were supposed to

Page 67

PROFESSOR GOULD - CROSS-EXAMINATION
structure our resources exactly as you had given in the sample paper?
        Do you remember that? I asked about -- because instead of just like a list of resources or references, it was using subscripts and I asked, to clarify, if that's exactly how we needed our paper to be done. So I was concerned about my ability to create, like, a table of contents and stuff. Do you remember that?
    A   I don't recall that aspect of that phone call.
    Q   Okay.
    A   Though I know I tell the students, generally, that I am pretty liberal whether you want to do footnotes or end notes, that kind of thing.
    Q   Yeah, I agree with that. Yeah, remember that part.
        Were they given the sample paper at all?
        DEAN WILLIAMS:  I did not provide the sample paper.
        MS. TSHUDY:  Okay.

Page 68

PROFESSOR GOULD - CROSS-EXAMINATION
        DEAN WILLIAMS:  It was just a sample paper.
        MS. TSHUDY:  It was a format that I had never used before, so that's why I was mentioning it, kind of thing. Normally I can list resources.
        PROFESSOR GOULD:  And just to clarify, I did not have a concern or complaint that Ms. Tshudy did end notes instead of footnotes. That was fine.
BY MS. TSHUDY:
    Q   Sorry, one moment.
        In regards to sort of the first half of my paper, was that cases that you knew that we went over and sort of discussed or at least were introduced to during class and sort of already had -- especially Momenta and stuff --
    A   Yes.
    Q   -- that's like common class coursework.
    A   Yeah. I mean, I found a big focus, especially this spring into the subject matter of testing methods for FDA as

Page 69

Proceedings
opposed to manufacturing processes, that was from Momenta. And then I remember you cited and discussed the Pfizer-Apotex Amlodipine case, which I knew very well and we covered in class. And you also put in your paper FTC v. Actavis, which we also -- that's in our text and we also covered in class.
        MS. TSHUDY:  Okay. I think that's all the questions I have.
        PROFESSOR BUTLER:  Any more questions for Professor Gould from this panel?
        UNKNOWN SPEAKER:  Oh, not for Professor Gould, but for Ms. Tshudy.
        PROFESSOR BUTLER:  Okay, let's get Professor Gould first.
        UNKNOWN SPEAKER:  Had you ever had any statement with either Ms. Tshudy or any other student that they would not have to cite to a resource for some reason?
        PROFESSOR GOULD:  No. I mean, I'm trying to understand.
        UNKNOWN SPEAKER:  If, for example,

18 (Pages 66 to 69)



Page 70

```
 1                  Proceedings
 2      information that they were citing to was
 3      widely known in the community, would
 4      that be a resource that they would not
 5      have to cite to for some reason?
 6          PROFESSOR GOULD:  Oh, I see.  It's
 7      always a judgment call.  I did not have
 8      that specific discussion with my
 9      students.
10          UNKNOWN SPEAKER:  Okay.
11          PROFESSOR GOULD:  I sort of
12      trusted that second or third year law
13      students, they would have some idea of
14      that.  I don't remember having that
15      discussion.
16          UNKNOWN SPEAKER:  So then to, I
17      guess, pull that out a little bit.  Is
18      the information and the analysis that
19      you saw in Ms. Tshudy's paper one that
20      is so broadly known within the
21      community -- and I will admit I know
22      nothing about patents, pharmaceuticals,
23      trade secrets.  So if I'm asking a
24      question that doesn't make sense, you
25      can tell me that.  But would the
```

Page 71

```
 1                  Proceedings
 2      analysis that she -- that Ms. Tshudy
 3      included in her paper and that we see
 4      also in Ms. Rogers' note, would that be
 5      so common in the community that it
 6      wouldn't be unusual?
 7          PROFESSOR GOULD:  Let me answer it
 8      this way.  I am, you know, somewhat
 9      familiar with scholarly works in this
10      area, though not an exhaustive way.  It
11      was surprising and new to me, but I did
12      not go ahead and do any kind of
13      exhaustive searching to see how that
14      would come up.  But I don't recognize it
15      common.  And, again, I didn't do any
16      kind of exhaustive searching to see how
17      that would come up.
18          UNKNOWN SPEAKER:  Is the result
19      that the court came to in Momenta what
20      was also relayed in the paper?
21      Ms. Tshudy's paper focuses so much on
22      the Momenta case.  Are her conclusions
23      ones that were obvious from the court
24      decision and Momenta.
25          PROFESSOR GOULD:  Once you read
```

Page 72

```
 1                  Proceedings
 2      the court decision of Momenta -- and the
 3      court decision, this is the 2012 Momenta
 4      case.  There's another one.  But in the
 5      2012 Momenta case, the court decision
 6      was a majority decision, it was somewhat
 7      controversial, and there was a strong
 8      dissent.  And so -- I'm sorry, I forget
 9      what the question was.  Sorry.
10          UNKNOWN SPEAKER:  Are the
11      conclusions that the court came to the
12      same as the analysis that Ms. Tshudy is
13      indicating in her paper?
14          PROFESSOR GOULD:  I believe she
15      did a fair analysis in summary of the
16      Momenta decision.
17          UNKNOWN SPEAKER:  I guess the
18      point of that question is:  Are those --
19      is there something unique about
20      Ms. Rogers' analysis and Ms. Tshudy's
21      analysis that somebody else might not
22      get from reading the Momenta decision?
23          PROFESSOR GOULD:  What was new to
24      me was -- again, Momenta was all about
25      patents and the Safe Harbor versus
```

Page 73

```
 1                  Proceedings
 2      infringement, nothing about trade
 3      secrets.  What was unusual for me was
 4      using that as sort of the cornerstone to
 5      launch into a strategy of relying on
 6      trade secret protection over patents.
 7      That I hadn't seen or looked into.
 8      Again, we're using that Momenta case to
 9      advocate the strategy.  I didn't recall
10      that one.
11          PROFESSOR BUTLER:  Can I pursue
12      that, but along a slightly different
13      line.  As the instructor who designed
14      the course and had certain expectations
15      about what general student work would
16      produce from an assignment like this,
17      would you say that the author's problem
18      was a footnoting issue?  Or that in
19      addition to that, or in place of that,
20      she drew something by way of
21      intellectual framework from Rogers'
22      piece.  She drew more than just copying
23      words.
24          Plagiarism -- to me, there's a
25      difference between copying and
```



Page 74

```
 1          Proceedings
 2    plagiarism.  There's an overlap, of
 3    course, but copying is repeating
 4    verbatim what somebody else has written.
 5    Plagiarism, it seems to me, is also
 6    taking something more, intellectually,
 7    from the overall product.  And how much
 8    is original and how much is not, would
 9    be the question.
10         PROFESSOR GOULD:  Well, as you can
11    see from the Turnitin program, a great
12    deal of copying, for sure.  What I also
13    tried to do was point out key passages
14    that matched up, often word-for-word,
15    that were analytical in nature and were
16    conclusory in nature and were unique to
17    each paper, at least from what I knew.
18         And that's also, in the
19    conclusion, was impressive to me that
20    this was not just summarizing cases or
21    quoting cases, but what I would have
22    regarded as an original idea, certainly
23    in Ms. Rogers' paper and I found that
24    same idea in Ms. Tshudy's paper.  If
25    that answers --
```

Page 75

```
 1          Proceedings
 2         PROFESSOR BUTLER:  And in your
 3    opinion, did Ms. Tshudy develop the idea
 4    into something more than Ms. Rogers had
 5    or was it essentially the same thing?
 6         PROFESSOR GOULD:  To get into that
 7    detail, I think the main idea, again,
 8    focusing on the Momenta case to then
 9    advocate for relying on trade secret
10    protection instead of patent protection
11    in the area of testing for FDA -- and
12    again, in the Rogers paper, she
13    constantly talks about bioequivalency
14    testing because that was the subject
15    matter exactly the Momenta case.
16         And so if you get into subtle
17    differences, I noted Ms. Tshudy, maybe
18    every time, but I saw it, generally, she
19    got rid of the word bioequivalency and
20    just talked about test methods.  And --
21    think about your question, is this a
22    case where Ms. Tshudy was broadening
23    this out beyond bioequivalency testing
24    to other testing, so that may be a
25    difference.
```

Page 76

```
 1          Proceedings
 2         This was not, again, from my
 3    knowledge of the scholarly work in this
 4    area, again, a lot was focused on
 5    manufacturing processes and preparing
 6    these biomolecules.  So focusing on
 7    testing as an advantageous way to use
 8    trade secrets was new to me.  And then
 9    to try and parse out differences, Ms.
10    Tshudy's papers, just by the language,
11    didn't just narrow it to bioequivalency,
12    but went, if I remember Ms. Tshudy's
13    paper often talks about testing methods
14    testing.  Testing, not just
15    bioequivalency.  So there's a
16    difference.  We're broadening out.
17         PROFESSOR BUTLER:  Okay.  Thank
18    you.
19         DEAN WILLIAMS:  Only for Professor
20    Gould, at this point.
21         ▆▆▆▆:  What kind of student was
22    Ms. Tshudy?
23         PROFESSOR GOULD:  First of all,
24    Ms. Tshudy was a remote student.  So
25    she -- I think, I mentioned it for
```

Page 77

```
 1          Proceedings
 2    participation because she was only --
 3    well, the IT group here at Dickinson
 4    said that they would not have remote
 5    students Zoom in to every single class,
 6    but they would allow it for two classes,
 7    one presentation.  Each student, as a
 8    sort of midterm project, does a slide
 9    presentation of their own topic, of
10    their own choice.
11         And then Ms. Tshudy also Zoomed
12    into the class for the last class when
13    she presented her brief summary of her
14    paper.  And I thought her slide
15    presentation was very good.  She got a
16    very high grade, I think 19 and a half
17    out of 20 points.
18         And then as part of being remote,
19    without the ability to Zoom in to every
20    class, I had spoken ahead of time to
21    Dean Gaudion and worked out a way for
22    Ms. Tshudy to submit short reflections
23    each class.  Not for every one, I
24    excused her on one or two, and others,
25    we sort of said, okay, of the remaining
```



```
                                            Page 78
 1            Proceedings
 2   12 classes, you can do 9 out of the 12
 3   and skip 3.  I forget the exact number.
 4        So she didn't need to do a
 5   reflection for every class.  I would
 6   guess, maybe, 4 or so.  She didn't have
 7   to.  But I found the reflections
 8   satisfactory, and she would get a
 9   relatively high grade on just
10   participation.
11        So that should answer your
12   question.
13            ▮: Thank you.
14            ▮: I have a question.
15        PROFESSOR BUTLER:  Please.
16            ▮: So you drew some
17   similarities, or you drew the exact
18   similarities between the papers pulling
19   on the phrases, devastating loss,
20   producers of lucrative goods, the weight
21   of the presumption of disclosure, as
22   well as, chilling participation.  In
23   finding or coming to a conclusion that's
24   consistent with the Momenta case, how
25   much variance could a student have with
```

```
                                            Page 79
 1            Proceedings
 2   those phrases?
 3        PROFESSOR GOULD:  I guess just
 4   personally, I found them especially
 5   unique.  I see what you're saying.  I
 6   mean, showing effect is a phrase we use
 7   in the law.  Devastating -- sort of a
 8   strong word, but -- I guess I can only
 9   give you my -- what I took from it.  I
10   found these, along with hungry eyes, as
11   being special, especially some of these
12   as unusual.  It got my attention and
13   served for me as sort of a fingerprint.
14   That's my take on it.
15            ▮:  And then my second
16   question.  I just want to reiterate,
17   what made you curious to Google the
18   information?
19        I know we've heard that the
20   information -- or the concept, I should
21   say, was new to you, and so you were
22   curious about it.  But we've also heard
23   information that it was presented to the
24   student at an earlier conference.  And
25   so, I'm wondering was it because you're
```

```
                                            Page 80
 1            Proceedings
 2   curious about that?  Was there something
 3   else that made you want to look up to
 4   see if the information was anywhere
 5   else?
 6        PROFESSOR GOULD:  By chance of
 7   it -- you said presented at another
 8   conference?
 9            ▮:  In the student
10   conferences.
11        PROFESSOR GOULD:  Oh, on the
12   phone.
13            ▮:  Yes.
14        PROFESSOR GOULD:  Oh.  In the
15   conferences on the phone, I don't
16   remember the mention of the Momenta
17   case, at all.  I knew the Momenta case,
18   the 2012, and there's another one later.
19   But it came as a surprise to me when I
20   saw the paper -- when I saw Ms. Tshudy's
21   paper, that was the first time I recall
22   anything from her about the Momenta
23   case, not even in her in class
24   presentation, I think.
25        It wasn't mentioned, that's my
```

```
                                            Page 81
 1            Proceedings
 2   memory, but I guess you could check, but
 3   that was new to me from her.  And I knew
 4   the Momenta case, but what was it -- a
 5   new thesis, from my view.  It was also a
 6   central thesis in the -- Ms. Rogers'
 7   note, was using the Momenta case as
 8   the -- not the starting point, but a
 9   cornerstone of the reason to advocate
10   for a strategy to actually, sort of,
11   affirmatively rely on trade secrets
12   rather than patents, that was something,
13   that strategy keyed off the Momenta
14   decision, was something I didn't recall.
15        And I wanted to Google it and see
16   if others had that strategy, and --
17   based on the Momenta case.  And then, I
18   think I mentioned, one thing I was
19   wondering about -- I think you could
20   protect this information.  I've done a
21   lot of litigation.  I think you could
22   protect this kind of information to a
23   good extent with protective orders,
24   again, the Stream of Information Act
25   requests would be decent protection.
```

21 (Pages 78 to 81)



```
                                    Page 82
 1              Proceedings
 2         But one thing that concerned me
 3    when I was reading that is, what would
 4    FDA do if FDA brought this test --
 5    whether you're calling a bioequivalency
 6    test or some other test -- for FDA
 7    submission, if FDA loved this test and
 8    wanted everyone to use it, which can
 9    happen, that was one of my concerns that
10    that would destroy that strategy.  And
11    so I wanted to see -- not only had
12    anyone used Momenta to advocate the
13    strategy, not just summarize Momenta,
14    but to advocate the strategy.
15         And if they had -- had they
16    discussed the risk to the trade secret
17    of FDA using it and disclosing it and
18    wanting everyone to do that.  It's sort
19    of hard to go back and remember your
20    thinking, but I remember that it's like,
21    wow, is anyone concerned?  Because I'll
22    also say in Ms. Rogers' note as well as
23    in Ms. Tshud- -- now, Ms. Tshudy's
24    paper, as long as you're doing this,
25    didn't discuss much, as I recall about
```

```
                                    Page 83
 1              Proceedings
 2    FDA use.
 3         In fact, there's a whole large
 4    section in Ms. Rogers' note on FDA use
 5    and citing the Ruckle House decision,
 6    that was not in Ms. Tshudy's paper.  And
 7    so in looking at Ms. Tshudy's paper and
 8    thinking about FDA use -- I think that
 9    explains that.  That was part of my
10    curiosity.
11         PROFESSOR BUTLER:           ?
12                   :  Just a few contextual
13    questions.  You mentioned that
14    Ms. Tshudy's presentation didn't
15    necessarily conform with the paper
16    itself.  Common among students, or is it
17    generally a pretty strong correlation?
18         PROFESSOR GOULD:  Oh, the
19    presentation in class?
20                   :  Yes.
21         PROFESSOR GOULD:  Oh, that can
22    vary.  Yeah.  And I'll also say
23    Ms. Tshudy got full credit -- just four
24    points -- got full credit for that short
25    presentation.  The presentation, I just
```

```
                                    Page 84
 1              Proceedings
 2    feel is more for the students to share.
 3         And to answer your question, some
 4    students will focus on a particular part
 5    of their paper, others will give them
 6    more complete review.  It's just a
 7    matter of variety.
 8                   :  And forgive my
 9    ignorance, but I've not yet had to
10    submit a paper in law school, but do you
11    find it's fairly common to have the
12    types of reactions you did to this paper
13    to go and do a little research on top,
14    or do you generally --
15         PROFESSOR GOULD:  Oh, I generally
16    do research.  I can't speak for every
17    professor.  My view, especially in these
18    papers, the students work so hard on
19    these, and there's a lot of research,
20    and it's a complex area.  I don't just
21    read the papers top to bottom -- how to
22    explain it.  I try to live the paper and
23    live the topic.  And so it's my standard
24    practice, I do pull up citations.  I
25    don't know if other professors do to
```

```
                                    Page 85
 1              Proceedings
 2    what extent.  I do with students'
 3    papers, look at some of their citations,
 4    the overview articles, and then I will
 5    go into Google searching.
 6         I find a lot of this very
 7    interesting too, so it's partly my own
 8    interest, but I do try and live their
 9    topic, if that makes sense.
10                   :  It does.  Thank you.
11         Last question, just clarifying, so
12    it sounds like the two of you had
13    probably four interactions, the two
14    classes that she was able to Zoom in to
15    and the two phone calls that you shared.
16         PROFESSOR GOULD:  That sounds
17    right.  The two classes, we had two
18    phone calls, and that was it.  And
19    again, reiterate, I didn't hear any
20    concerns expressed or request for
21    another phone call.
22                   :  Thank you.
23         PROFESSOR BUTLER:  Anybody else
24    have questions?  Ms. Williams -- Dean
25    Williams.
```



|  | Page 86 |
|---|---|
| 1 | Proceedings |
| 2 | DEAN WILLIAMS:  I just want to ask |
| 3 | you one further question and that is: |
| 4 | How -- in your experience, have you seen |
| 5 | before students present the same |
| 6 | analysis in the same order, using the |
| 7 | same cases as a Law Review note? |
| 8 | PROFESSOR GOULD:  I don't recall |
| 9 | anything.  I don't, specifically, recall |
| 10 | anything, especially in a unique topic |
| 11 | like this. |
| 12 | PROFESSOR BUTLER:  Yes. |
| 13 | ▮▮▮▮▮▮▮:  I know it was |
| 14 | mentioned that there's a sample paper |
| 15 | that was given to demonstrate structure |
| 16 | that was desired for the paper.  Did her |
| 17 | paper follow that same structure? |
| 18 | PROFESSOR GOULD:  I feel her paper |
| 19 | complied.  Again, the sample paper -- |
| 20 | and it's one another professor at |
| 21 | Dickinson provided as an example they |
| 22 | use.  I think it's fair to say that the |
| 23 | students in my classes also, two years |
| 24 | ago, understood that I was very liberal, |
| 25 | and I did not hold that against -- |

|  | Page 87 |
|---|---|
| 1 | Proceedings |
| 2 | Ms. Tshudy's paper, for instance, that |
| 3 | they were end notes rather than |
| 4 | footnotes.  I'm pretty liberal on that, |
| 5 | and that was not a problem in Ms. |
| 6 | Tshudy's case. |
| 7 | ▮▮▮▮▮▮▮:  Sorry, I just want to |
| 8 | clarify one aspect of it.  So whenever |
| 9 | you all talk about structure, are you |
| 10 | speaking just specifically about the |
| 11 | footnotes or the way that the references |
| 12 | are, or are you speaking in regard to |
| 13 | how the paper should develop. |
| 14 | PROFESSOR GOULD:  At first -- and |
| 15 | now I see where you're going -- so |
| 16 | there's nothing about the sort of |
| 17 | pedagogical structure about the sample |
| 18 | paper that students have to comply with. |
| 19 | So that's first.  And I think everyone |
| 20 | understands that because I've got a lot |
| 21 | of good papers with a lot of different |
| 22 | structures.  That's not a problem. |
| 23 | And what I was talking about here, |
| 24 | in structure, is the substance of the |
| 25 | structure.  The idea of starting with |

|  | Page 88 |
|---|---|
| 1 | Proceedings |
| 2 | the Momenta case and focusing on it, in |
| 3 | my view -- and I know I mentioned Ms. |
| 4 | Tshudy cited a couple of other cases |
| 5 | that were not in the Rogers' note -- and |
| 6 | then the structure of arguing or |
| 7 | advocating off the meta paper to prefer |
| 8 | trades -- to rely on trade secrets and |
| 9 | not patents. |
| 10 | And then I talked about |
| 11 | substantive structure.  And then the |
| 12 | second part in both papers to then look |
| 13 | at the risks to that strategy, so I was |
| 14 | talking about the substantive structure, |
| 15 | not the formalistic structure, if that |
| 16 | answers -- |
| 17 | PROFESSOR BUTLER:  Very good. |
| 18 | Ms. Tshudy, if would you like now |
| 19 | to make your presentation. |
| 20 | MS. TSHUDY:  Yes, actually. |
| 21 | DEAN WILLIAMS:  Professor Butler, |
| 22 | would it be okay if we took a |
| 23 | five-minute break right now. |
| 24 | PROFESSOR BUTLER:  Yes. |
| 25 | DEAN WILLIAMS:  And then we can |

|  | Page 89 |
|---|---|
| 1 | Proceedings |
| 2 | come back for this testimony? |
| 3 | PROFESSOR BUTLER:  Five minutes? |
| 4 | DEAN WILLIAMS:  That'd be great. |
| 5 | Thank you. |
| 6 | PROFESSOR BUTLER:  Strictly |
| 7 | understood. |
| 8 | DEAN WILLIAMS:  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  |
| 20 | (Thereupon, a recess was taken, |
| 21 | and then the proceedings continued as |
| 22 | follows:) |
| 23 | PROFESSOR BUTLER:  All right.  We |
| 24 | will reconvene. |
| 25 | Ms. Tshudy, the floor is yours. |

23 (Pages 86 to 89)



Page 90

        Proceedings
    MS. TSHUDY: Okay. So just to
start before I, like, get into what I
had prepared, like, as a response, I
actually found the hearing so far very
enlightening. And I honestly had never
assumed any ill will or mal-intent. But
I really think that I'm going to be able
to show that this is just, like, a
complete misunderstanding, in a way.
    I really would have hoped -- I
guess I really would have hoped that
more research would have been done,
especially, you know, after having a
short time, you know, at least just a
little time, to discuss it with Dean
Williams about how much of this is very
generalized information. So I'm hoping
I can show that to you -- but just to
make sure that it doesn't necessarily
come off or get interrupted.
    As Professor Gould was going
through particular phrases that he found
were complete new and original ideas. I
just went into Google and just typed in

Page 91

        Proceedings
them, just to see the backing. And so
the last one he went through was the
viability trade secrets being a viable
alternative to patents, for example.
And I didn't want to necessarily take
the time right now to hook up my
computer, but if you read what I just
get straight from Google, there is --
even from the beginning, an entire paper
on trade secrets as a viable alternative
for patent law.
    And so I hope I'll go through
everything, but I just wanted to give an
example that if you really do take these
phrases or, you know, things, like,
borrow and stuff and actually like
search, that I would actually, kind of,
in part, suspect -- not necessarily
suspect -- the note of, you know,
pulling -- plagiarizing from other
people's work. But at least I feel like
from what I've even seen from hers, it
kind of generalizes the same sort of
resources that I was even using for this

Page 92

        Proceedings
information, which I think is, kind of,
really interesting.
    DEAN WILLIAMS: Ms. Tshudy, we can
certainly put your computer --
    MS. TSHUDY: Well, I was going to
go and just do my testimony.
    DEAN WILLIAMS: Okay.
    MS. TSHUDY: And then I can, like,
show stuff too --
    DEAN WILLIAMS: Sure.
    MS. TSHUDY: -- as desired. I
just don't want to bore you with just
like a Word document, straight up.
    First, I just wanted to give just
my initial response explanation, because
I'd rather prefer that, and then I can
address things that were said, if that's
okay with everyone. So I did put a
quick note, just so that everyone
understands, that I would have
definitely preferred, you know, just to
resolve this by discussion and agreement
and everything. I was given a very
short amount of time to decide and,

Page 93

        Proceedings
again, making the agreement would have
required me to say that I knowingly or
intentionally plagiarized.
    And as you'll see, that's the only
reason why we won't come to agreement,
because I think with being able to
explain everything and tell them
everything that happened and give them
all these different papers that are
incredibly similar that this would have
been resolved just from discussion. But
the timetable I was given was too short
for me really to do that. So Dean
Williams wanted an answer. And I said,
well, I'd love to discuss, but
ultimately if you need an answer, it's
not something I can do.
    But I'll just read my testimony
for now. And the only reason I'm
reading it is because there's a lot to
grasp, so I just think it's easier if
it's organized so I don't miss anything.
    I really do appreciate having this
opportunity. I've had many experiences

MAGNA LEGAL SERVICES

```
                                                Page 94
 1              Proceedings
 2      where people in my life have even gone
 3      to the extent of committing suicide when
 4      they are faced with false accusations
 5      and weren't able to give their idea or
 6      have a court like this to reach out to,
 7      so I appreciate you taking the time to
 8      hear me, although I greatly regret
 9      having to make such a request.
10              My history has given me burden
11      syndrome, which is something where --
12      sorry, I'm cutting out some -- where you
13      literally will avoid burdening others
14      with hearings such as this at all costs,
15      except for the fact that I can't do it
16      if it requires me to admit to something
17      I haven't done.  I've learned to accept
18      punishment or loss of achievement as a
19      result of imperfection -- or I have
20      learned that sometimes agreeing to lose
21      or settling is reasonable because of how
22      much of a toll it can take, even just
23      for the chance to win.
24              But I've also learned that there's
25      nothing more important in this world
```

```
                                                Page 95
 1              Proceedings
 2      than honesty.  And as much as the stress
 3      of all the events that have occurred
 4      over this past year makes me want to
 5      simply accept punishment just to avoid
 6      this process, I cannot give in to the
 7      only thing that has sustained me through
 8      it all, which is my integrity.
 9              And so I'm not afraid to fail,
10      perhaps I once was, but that quickly
11      ends when you suffer from a prolonged
12      disease.  For comparison, I've been
13      treated -- I've had a debilitating
14      illness for 20 of my 28 years.  I've
15      kind of learned that certain times you
16      fall short, so I have no issue admitting
17      when I'm at fault or when I'm in the
18      wrong, and, again, that's never been a
19      problem for me.  And pride, for sure, is
20      not a problem for me.
21              I am happy to admit that I failed
22      to grasp the potentiality of my work to
23      be considered plagiarized.  I thought
24      that the information that I'm going to
25      show you was readily known and well
```

```
                                                Page 96
 1              Proceedings
 2      known, but perhaps that comes at the
 3      toll of researching a topic so
 4      indepthly.  And right now I might be
 5      kicking myself that I wrote a paper
 6      somewhat advocating for the same trade
 7      secrets that could be concealing the
 8      technology that could project my
 9      memories onto the big screen for you to
10      see for yourself.
11              But I digress, this is such a
12      painful thing to be accused of something
13      that I even went so far as to use the
14      money I had been given for Christmas
15      presents to pay for a, like, sit-down
16      with a polygraph examiner in eagerness
17      for the chance to exonerate myself.  But
18      unfortunately, that wasn't able to be
19      done this quickly.  And there's
20      indicators that polygraphs aren't -- I
21      learned a lot about polygraphs, and I
22      don't know if it would really fit this
23      setting just because of how broad it is,
24      but I would be happy to do it if you
25      ever required it.
```

```
                                                Page 97
 1              Proceedings
 2              Originally, I presented Professor
 3      Gould with two topics:  The Right to Try
 4      legislation and something involving how
 5      lawyers should guide biotech startups
 6      and set them up to succeed.  So it's
 7      more like IP protection and prevention
 8      of lawsuits.  And that was on
 9      September 3.  If you want me to go
10      through the emails, I have all of them.
11              He responded for his concern that
12      the second one, the trade secret
13      protection, might be quickly moved
14      towards a business school project.  So
15      that was just his initial, like, just
16      watch to make sure that it's not
17      business school.  I have the emails,
18      too, so if you need the exact wording,
19      we can pull that up.  And that was also
20      the date where he explained that
21      participation could be met through
22      submissions of responses to each of the
23      cases that we read.
24              So in response to my participation
25      submission on October 12, which was
```

25 (Pages 94 to 97)



```
                                            Page 98
 1               Proceedings
 2   after a painful gap because -- this
 3   isn't to elicit pity, but this is to
 4   kind of understand why it was difficult
 5   and there were some gaps of
 6   communication between us.  I lost my
 7   mother this past semester and then --
 8   that was unexpected -- okay, sorry.  And
 9   then two weeks after I lost both of my
10   actual pets, one was killed instantly
11   and the other I spent the rest of the
12   semester searching for it.
13          So October 12 was four weeks after
14   that and two weeks after the tragic
15   incident and Professor Gould had been
16   kind enough to grant me a little leeway,
17   just like a little gap in communication.
18   But then October 12 is when he notified
19   me that he'd like to, now, get to -- get
20   together and discuss the topic.  And so
21   I definitely appreciated just having
22   that for me to gather myself.
23          And so he specified that the Right
24   to Try -- well, originally I said Right
25   to Try bill, and that made sense, he
```

```
                                            Page 99
 1               Proceedings
 2   said would be better, like the
 3   presentation and sort of recommended
 4   that trade secrets would probably be
 5   better as the actual research paper.  I
 6   later found out that you can -- Right to
 7   Try legislation is even a bigger topic,
 8   but to me it made complete sense, what
 9   he admitted -- so I'll explain the
10   importance of that later.
11          And then on Friday, October 15th,
12   we had a phone call and he sent me
13   articles in response to our short talk.
14   And originally when the accusation came,
15   I actually thought that the note was
16   part of these, like one of -- the part
17   of the articles that he sent me in
18   response to just me giving him this
19   topic.  Looking back, I realized that it
20   was not, but I knew that was something
21   that had come up earlier.  But obviously
22   to me it was like -- I knew of the note,
23   but it wasn't even something that I
24   would use because it was something
25   literally sent to me by my professor,
```

```
                                            Page 100
 1               Proceedings
 2   initially.
 3          Now, I've corrected that in my
 4   knowledge, but to me I thought that it
 5   was originally sent from him.  And then
 6   it was only with reminders of looking
 7   into this that I realized that that was
 8   not the case.
 9          On October 20th, I believe, we met
10   again and Professor Gould sent me a
11   responsive email.  He said, With
12   specific regard to your research plan,
13   you have a good deal of flexibility as
14   these plans are ungraded and mainly for
15   you to present to me to present to me
16   for the purpose of soliciting my input
17   on how your research project is going.
18   Typically research plans are two or
19   three pages and provide a rough initial
20   outline of the eventual paper as well as
21   identification of issues, research
22   strategies and some important
23   references, cases, articles identified
24   thus far.  You can submit your research
25   plan as late as October 25, without
```

```
                                            Page 101
 1               Proceedings
 2   penalty.
 3          And so this goes to -- so then the
 4   next time that we really discussed --
 5   then was the actual outline, which is
 6   what he was just describing.  And so the
 7   outline, I believe, was provided into
 8   evidence.  And it is pretty
 9   helter-skelter, not very well-developed.
10   But again, based on what he described me
11   he wanted, it applied.  And if you look
12   at the outline, you can see that I
13   copied and pasted different sources
14   beneath it, for two reasons, one was
15   because he had mentioned that you can
16   include different cases and stuff if you
17   think it might pertain later.
18          And the other thing was that I was
19   currently living the semester out of my
20   car because I was still searching for my
21   other pet, so I only had periodic access
22   to WiFi.  So I've never just copied and
23   pasted sources straight to an outline.
24   But given his comment above, and given
25   the idea that I didn't always have or
```

26 (Pages 98 to 101)



```
                                                    Page 102
 1              Proceedings
 2     rarely had WiFi or Internet connection,
 3     it was literally there in case what we
 4     went over on the outline made it worth
 5     reading.
 6          So at that point -- at that point
 7     as you'll actually learn, I never
 8     actually read through the entirety of
 9     the note beyond reading, maybe, the
10     introduction and I don't even think I
11     looked at the structure necessarily.
12     And then I did look at the resources,
13     but I'll explain that later.  But I
14     copied it and other resources as
15     potential aids so that I could read them
16     if I got around to it since the topic
17     was really broad.
18          I actually mentioned this to
19     Professor Gould, that I was more
20     interested in a trade secret versus
21     patent debacle.  But during this meeting
22     and the notes that you can see from the
23     outline, he really seemed to emphasize
24     his desire to hear about these emerging
25     issues in trade secret litigation coming
```

```
                                                    Page 103
 1              Proceedings
 2     from discovery.  And I think that's
 3     probably one of the reasons that I got
 4     such a good grade on my presentation was
 5     because I actually concentrated on what
 6     he really liked.  So I feel like -- I
 7     think other students generally do that
 8     if you hear a professor really push for
 9     something.
10          So I just wanted to repeat that I
11     did not read more than, maybe, the first
12     paragraph of the note before copying --
13     yeah, so I discovered the note right
14     before a meeting and that's why it is on
15     my outline.  So I literally did not read
16     more than the first paragraph of the
17     note before copying it over and I never
18     actually read through the thing or read
19     even, I would say, significant amount of
20     the entire note.
21          But I did know of the note.  And
22     again, I copied this over directly to
23     the outline that I shared with Professor
24     Gould, so he knew from the beginning
25     that I knew of this note.  I copied with
```

```
                                                    Page 104
 1              Proceedings
 2     other resources as well, but it was
 3     located in the bottom of the outline.
 4     And this was mentioned as well by Dean
 5     Williams that it was literally attached
 6     at the bottom of the outline with other
 7     excerpts and ideas that I thought that I
 8     could possibly mention to Professor
 9     Gould later.
10          And this was all based on the fact
11     that his description of what the outline
12     could be mentioned that you can include
13     that stuff, because obviously I wouldn't
14     to try to include that and pretend that
15     it's part of my outline at all.  But I
16     think it was pretty obvious because
17     there's like a straight research paper.
18          At most, even when comparing the
19     two, after hearing about the allegation,
20     I wanted to sort of wait to really look
21     in depth because I was still
22     contemplating, you know, still looking
23     into the polygraph option because I
24     thought that would be easier and I
25     didn't want to make myself remember.
```

```
                                                    Page 105
 1              Proceedings
 2     With polygraph, you can't make yourself
 3     remember iffy so I can't say that I've
 4     never read it if I've read it in
 5     reference to an allegation, if that
 6     makes sense.  So that's the only reason
 7     that I was kind of hesitating like going
 8     through each exact detail because I knew
 9     that I could.
10          And so as I said, the note was at
11     the bottom of my outline, even though I
12     did not know that before.  And I --
13     Professor Gould and I never actually
14     went below my outline for discussion.
15     So we didn't talk about it.  But it was
16     there if he wanted to and if you wanted
17     to review it at any point because it was
18     there with a bunch of other things.
19          We mostly concentrated on the
20     actual outline that I presented, which
21     was like Roman numerals and everything.
22     So I think, he kind of just dismissed
23     the sources, but they were there and,
24     like I said from the beginning, open for
25     him to see if he desired to look.
```



```
                                                  Page 106
 1                   Proceedings
 2           So this meeting did change my
 3      approach drastically.  So even with this
 4      initial outline that even had that
 5      copied at the bottom, I actually decided
 6      to start a completely new outline, so --
 7      I didn't delete my original outline.
 8      But, I can show you, I have a second
 9      outline that I did just because we made
10      such drastic changes to what I was going
11      to talk about.  So even though I had her
12      note on that outline, I never really got
13      the chance to read it and look into it
14      because I started a separate one.
15           And so the next step that I went
16      into was scouring for resources.  And in
17      first year legal analysis and writing,
18      we faced this battle of when to cite
19      primary or secondary resources.  It
20      resulted in citing secondary, if you are
21      including what they specifically pulled
22      from the case or the analysis, that is
23      not like a general headnote or a common
24      quote or if you only had it -- or heard
25      of it because of their paper.  But if
```

```
                                                  Page 107
 1                   Proceedings
 2      you are just using them to get general
 3      background information and find sources
 4      that could be primary sources that could
 5      be pertinent to the area looking at,
 6      that citation isn't required.
 7           So knowing we had similar aspects,
 8      I would have wanted to include the note
 9      in my resources -- in my resources just
10      to cover my bases even though I never
11      actually read it and because, as you'll
12      hear, the one thing I do admit to using
13      or harnessing from secondary sources is
14      their list of resources.
15           But again, I did this with
16      multitudes of papers.  It's just a good
17      way to get primary sources, which I was
18      struggling with at the beginning because
19      I didn't want to make the second half of
20      my paper be too business minded like he
21      had warned me about, so I needed
22      resources that I knew were, like, at
23      least generally biotech and
24      pharmaceutical related.  And so that is
25      probably a reason that some of the
```

```
                                                  Page 108
 1                   Proceedings
 2      resources come -- are similar.
 3           So I had asked him, on that same
 4      date, if we're supposed to follow the
 5      sample paper.  And on the sample paper
 6      it uses subscripts so you can use
 7      footnotes and he gave that as an option.
 8      And so, again, it wasn't a requirement,
 9      it was an option for background data.
10      But he didn't want any of our 20 pages
11      to be committed -- any of our 20
12      required pages to be committed to this
13      background data, so it was just whether
14      we wanted to include it as an option,
15      that was allowed.
16           But the actual structure of the
17      sample paper was that you use subscripts
18      for citations.  And if you look through
19      my paper, I have citations for almost --
20      nearly every single sentence, so there
21      wasn't any -- I had even looked and
22      discussed with friends and people about
23      if there was anything in my paper that
24      would be specific to background articles
25      that I had read and we couldn't really
```

```
                                                  Page 109
 1                   Proceedings
 2      find any area that could -- we didn't
 3      find anything that was unique to them or
 4      any area that we could subscript it to
 5      being specifically found from them.
 6           Especially because, again, I
 7      hadn't read this paper.  I was just
 8      trying to figure out a way to work it
 9      into the subscript resourcing that I had
10      never done before.  Because normally I
11      just do resources inputted into the
12      paper, but then you can also have an
13      additional resource list that doesn't
14      tie to the subscripts.
15           So I had asked him specifically if
16      we're supposed to copy the structure of
17      the sample paper and include in our
18      resources things that could be directly
19      tied into or at least subscripted to
20      like a direct sentence in our document
21      instead of just resources that, you
22      know, generally have similarities.  And
23      so he responded to follow the sample.
24      And this was because of the multitude of
25      resources that I connected -- that I
```




```
                                                  Page 110
 1              Proceedings
 2   connected with and can connect to any
 3   part of my paper, but particularly the
 4   second half.
 5         At this point I had used --
 6   surprisingly used Google so much to
 7   determine the biggest issues and general
 8   approaches to them that, surprisingly,
 9   ads -- like, advertisements for firms
10   were continuously popping up, where each
11   law firm went through the same main
12   issues in the same order and in the same
13   way.
14         The federal roles of Civil
15   procedure 26 and 45, for example, were
16   written about by so many of these
17   companies whenever it came to those same
18   orders.  The only difference with how
19   these were portrayed was the cases
20   between all of those, so the order was
21   the complete same, the only difference
22   would be in whichever case they chose to
23   use.
24         And again, I chose biotech and
25   pharmaceutical cases to make sure it
```

```
                                                  Page 111
 1              Proceedings
 2   wasn't like a business paper.  Which
 3   means that my cases coincided with the
 4   cases shown in the note, but that was
 5   also not unique.  I can also find papers
 6   that coincide some of the same cases to
 7   make the same conclusions in other
 8   people's papers as well.
 9         So that's why I tend to, if I am
10   going to -- if I do use secondary
11   sources for resources, I tend to try not
12   to read the paper so that my analysis
13   can be apart from theirs.  That's why,
14   you know, just to be safe, I just don't
15   like to even conflate the two.
16         So one such person would be my
17   witness who was able to see my
18   frustrations.  And I literally would go
19   through and show, like, hey -- I'd get a
20   lot of opinions.  The problem with being
21   a remote asynchronous person means that
22   I couldn't get opinions of school
23   officials because I wasn't on campus.
24   So I have a multitude of people that I
25   discuss this with and ask their opinions
```

```
                                                  Page 112
 1              Proceedings
 2   of -- which is also allowable as seen in
 3   the syllabus.  If you saw that
 4   distinction, we're allowed to, kind of,
 5   like, discuss things like this -- just
 6   to make sure that I wasn't over assuming
 7   the generalizations that were given to
 8   me.
 9         So I'd show people, I'd go through
10   like five or six or eight different
11   papers that were organized in the same
12   way and pretty much had the same things,
13   just different cases and they were like,
14   yeah, that seems like generalized
15   information for the area.
16         And so I did bring a witness and
17   that's one of the things that they can
18   attest to.  As I said, I asked opinions
19   of others regarding this issue and
20   others when it came to citations and
21   they felt that the precautions I took
22   would definitely be enough when looking
23   at the multitude of articles that
24   conveyed these exact same opinions and
25   conclusions and agreed that it must be
```

```
                                                  Page 113
 1              Proceedings
 2   generalized knowledge and not original
 3   ideas.
 4         I honestly thought that I would
 5   get a bad grade because even though I
 6   used biotech and pharma sources, my
 7   research revealed that even though this
 8   topic appears emerging, it is widely
 9   overstudied now and that Professor Gould
10   would think that I was just adding it to
11   meet the minimum pages required.
12         The only reason that this note
13   would be any closer, as I already
14   mentioned, I did use some sources that I
15   took from the bottom of the page.  Again
16   not reading any of its analysis of it.
17   But this was all added to one big
18   resource document that I compile and
19   then I go through each case
20   individually.  And then I just delete
21   resources if I find they don't pertain
22   to what I want to write about.  So it's,
23   like, just a different organization,
24   and, normally, it's very effective at
25   preventing this from happening, or it
```



```
                                          Page 114
 1                Proceedings
 2     always was effective from preventing
 3     this from happening because, normally,
 4     you'd throw out a bunch of cases that,
 5     you know, don't really tie in.
 6         I even mentioned this in my emails
 7     to Professor Gould that I do use this
 8     resource list or use secondary sources
 9     and background info to gain resources
10     pertinent to this.  And I admit that I
11     found a lot of incredible decisions, and
12     even mentioned it in my class
13     presentation of my paper, that were
14     astonishing but weren't biotech and
15     pharma context, so I said I would only
16     include them if I found out that I did
17     not have space.  But in avoiding the
18     paper being too general and business
19     related, I knew that the only chance for
20     Professor Gould not flagging it as a
21     business paper was to make sure that I
22     used those biotech and pharma cases that
23     I found.
24         When I created the resource list,
25     I removed information designating where
```

```
                                          Page 115
 1                Proceedings
 2     I got them, but, again, that's because I
 3     went through each individual case and
 4     assessed them individually.  And these
 5     same cases, if you go to them, you can
 6     literally see them cited in a multitude
 7     of secondary sources and multiple people
 8     are making the same exact conclusions
 9     from them, which I didn't necessarily
10     know.  But in general, whenever I was
11     reading in background, trying to decide
12     what to do my paper on, that's just kind
13     of the info that really gives you what
14     to write about.
15         So it didn't necessarily surprise
16     me that our papers were similar, but I
17     still retain that there are documents
18     out there that are as similar just in
19     different ways as her note.  In fact,
20     Dean Williams, I think, or Professor
21     Gould mentioned that when I was
22     originally contacted, I thought it was
23     regarding the fact that I had included
24     my response and analysis from my
25     participation submission, but explained
```

```
                                          Page 116
 1                Proceedings
 2     that this was a backup in case I had
 3     technical difficulties meeting my
 4     participation requirements that day in
 5     class.
 6         So the actual analysis that I had
 7     sent to Professor Gould was never used
 8     for class credit because I was able to
 9     participate in person then because we
10     didn't have technical issues.  So I
11     didn't think that it was an issue of,
12     like, duplicating my submissions.  I
13     also explained that the first half of my
14     paper is, in large part, what we
15     discussed in class, and the second half
16     of my paper is so widely known and
17     accepted that it risked a really
18     horrible grade by Professor Gould for
19     being too generic.
20         Dean Williams continued to
21     reiterate that this is a very serious
22     thing and I explained that I completely
23     agree and that I was simply confident
24     that an explanation and ability to
25     discuss would set the record straight.
```

```
                                          Page 117
 1                Proceedings
 2     To be honest, the initial fear and dread
 3     in response to a false accusation of
 4     plagiarism had already been used up
 5     earlier in the semester when I wrote a
 6     hypo for Professor Prince that was as
 7     unique as my best friend who is a
 8     falconer and the partnership trouble she
 9     was going through trying to protect her
10     new wildlife education business, which
11     was so completely unique in every way.
12         But I still freaked out just at
13     the fact that I didn't know how to prove
14     my innocence beyond knowing my
15     innocence.  So I explained everything I
16     did, offered up my computer history for
17     her to have IT look at it, and sent her
18     pictures and info on my friend to assure
19     her I was telling the truth.  So
20     fortunately, crisis was averted.  But
21     that should just go to show that this is
22     like what's dreaded and -- by any
23     student I would feel -- but particularly
24     would be the exact worst thing for me to
25     hear.
```



|  | Page 118 |  | Page 119 |
|---|---|---|---|
|  | Proceedings |  | Proceedings |

Page 118

1  Proceedings
2  When I went to gather evidence, I
3  sent Dean Williams, I think, 33 articles
4  that I found within minutes or an hour
5  that had very similar subject matter and
6  very comparable sections, as mentioned,
7  regarding the organization of my paper,
8  particularly the second half that they
9  keep mentioning, that the papers track
10 on the same organization.  There, again,
11 is a multitude, not even a
12 comprehensible number of articles and
13 advertisements and papers that use the
14 exact same structure for going through
15 the risks of litigation because it's so
16 written about.  So my structure was
17 literally just based on the fact that
18 they all be structured the same.
19       And all I would do is I'd actually
20 eliminate, like, any ones that were
21 particularly unique because I wanted to
22 at least make sure that I had the main
23 things covered.  And the unfortunate
24 thing -- and also another reason why I
25 have a witness -- is that when it came

Page 119

1  Proceedings
2  to the actual firm advertisements where
3  they had specific articles articulating
4  how they would protect biotech IP from
5  disclosure through litigation -- it was
6  like a bunch of them -- I didn't realize
7  that they were advertising to me because
8  I had looked so extensively for this on
9  my computer, so I didn't realize how
10 important the cookies were.
11       And so before I had known that
12 this was even going to be a thing and as
13 a person who's particularly paranoid and
14 has never actually cleared her history
15 or cleared her cookies before, I was
16 actually required to do so in order to
17 access my book list to order my books
18 for this semester.  So he specifically
19 helped me with that because I was, like,
20 is there any way I hate clearing my
21 history, I do not want to do this, and
22 that we literally could not access my
23 book list.
24       And again, I didn't know at the
25 time that this was even a thing.  This

Page 120

1  Proceedings
2  is just how paranoid I am.  I didn't
3  know at the time that this would affect
4  it.  But we ended up that was literally
5  the only way to resolve it so that I
6  could access my book list and order my
7  books.
8       And then it was later, a week
9  later, that Dean Williams contacted me.
10 And so I didn't realize that all those
11 cookies from me searching for things
12 over and over throughout the semester
13 are exactly what led to the computer
14 thinking that I was in dire need of a
15 firm to represent me in a trade secrecy
16 case and that's why there are endless
17 amounts of ads from firms where they're
18 all going through these same risks of
19 litigation and explaining their approach
20 to defending against them and, you know.
21 And again, they're all exactly the same
22 for the most part.
23       So to me it was generalized
24 information and I didn't look at a
25 single one to get this.  So I can still

Page 121

1  Proceedings
2  find sections that duplicate almost
3  everything in my paper.  Not that I took
4  anything from these, it's literally just
5  from straight searches through Google,
6  Lexus or West Law of like -- any section
7  in my paper you can find duplicates of
8  stuff.
9       But some of them are in incredible
10 numbers.  A number of things that I read
11 that I couldn't really cite especially
12 based on Professor Gould's desired
13 format because they were too numerous
14 and didn't reference -- there weren't
15 any original references because, you
16 know, they were throughout just
17 considered general knowledge.  And I did
18 not use a single paper, side by side or
19 indepthly -- I don't even think that I
20 used resources within the same week or
21 month as writing my paper, if I'm being
22 completely honest.
23       I just, lastly, want to talk about
24 my motive.  You may not know this but
25 this semester has sort of been a

31 (Pages 118 to 121)

