```
                                               Page 122
 1                 Proceedings
 2      disaster just from the suffering that
 3      I've gone through.  And my first
 4      semester was awful because I lost sight
 5      in one of my eyes and had to rely on
 6      audio instead of visual when I am a
 7      visual learner.
 8           So this is important because I am
 9      not in the running for best student or
10      top of my class.  And even before that,
11      as I explained, that while I was
12      incredibly motivated and driven to
13      perform extraordinarily well in school,
14      for the most part, health issues took
15      that out of my control and I learned
16      that perfectionism and performance
17      didn't matter more than relationships
18      and connections.
19           I have had to learn in my life
20      that circumstances require humility and
21      grace, which means that if I truly felt
22      that I could not complete the paper on
23      my own, I wouldn't have hesitated to
24      convey this to the administration.  I
25      have no pride, in this way, holding me
```

```
                                               Page 123
 1                 Proceedings
 2      back or keeping me from seeking help.
 3      While I don't have pride that keeps me
 4      from admitting mistakes or prevents me
 5      from admitting when I simply can't do
 6      something, I do have the desire to
 7      please.
 8           And even though I can no longer
 9      compete -- compete for the best of the
10      greater, I can at least be true and
11      honest.  Beyond people thinking ill of
12      me or questioning my integrity, being my
13      second-to-worst fear, my worst fear is
14      not being able to correct people's
15      opinions of me and losing their respect.
16      As soon as the suspicion formed in
17      Professor Gould's head, I received one
18      of the worst punishments, the loss of
19      his respect that would go along with
20      losing his offer to sponsor me for an
21      independent study.
22           Because I explained how
23      researching the Right to Try legislation
24      for my presentation solidified the need
25      for me to write a research paper on this
```

```
                                               Page 124
 1                 Proceedings
 2      topic, in his kindness and generosity,
 3      he gave me the offer that would give me
 4      credit for such an endeavor.
 5           I have rarely, if ever, been
 6      extended such kindness.  The idea that I
 7      would elect to even risk this gift is
 8      incomprehensible to me.  And my heart
 9      truly breaks knowing that I have somehow
10      failed to avoid suspicion or document my
11      entire research process so that I could
12      have overwhelming evidence to support my
13      innocence before needing to come to,
14      obviously, this hearing.
15           So just a quick summary of the
16      main points is that the first half of my
17      paper was directly, like, what we went
18      over class curriculum.  My analysis with
19      them wasn't anything particularly unique
20      and, yeah, they hadn't challenged my use
21      of my own work in my paper, like my
22      previous work in my paper so I don't
23      believe that needs to be addressed.
24           Again, the topic wasn't dictated
25      by what I found.  Like, I didn't find
```

```
                                               Page 125
 1                 Proceedings
 2      the article and dictate the topic.  I
 3      actually changed my outline based on
 4      Professor Gould's responses to the ideas
 5      I had come up with and that was really
 6      what he really enjoyed.  And I never
 7      read through the resource, but it was
 8      included at the bottom of my outline
 9      from the beginning, so it was very out
10      there for anyone to see.
11           And the only thing that I actually
12      used it for was, most likely, sources in
13      the end, although these were the same
14      sources that were cited in a bunch of
15      other papers as well regarding the
16      topic.  So I can't necessarily say that
17      they were just exactly from this one,
18      but I think that I initially had taken
19      the sources, copied them to look through
20      them.  And I tend to -- as I'm going
21      through other secondary sources, I tend
22      to do little tallies to see how many
23      seconds -- to -- secondary sources find
24      that these same cases were valuable.
25           So in this, I'm not looking at the
```



```
                                             Page 126
 1                Proceedings
 2     analyses offered by each of these, but
 3     I'm literally just tallying up, like,
 4     which cases have really valuable
 5     significant information, just to
 6     prioritize them in my reading to include
 7     them into my case.  And as you go
 8     through the different cases, we can look
 9     at most of what is highlighted as, like,
10     paraphrasing or similar, between us, are
11     quotes from cases.
12         And if you look at most of the
13     cases that I have here, either the area
14     that applies to, like, trade secrets or
15     is at all related is very short or the
16     actual entire case is very short.  And
17     so the quotes or the actual, you know,
18     specific things that are mentioned by
19     the court that are rapidly used are the
20     same for many papers, if that makes
21     it -- that's why we have Headnotes and
22     such on LexusNexus is really based on
23     the specific idea.
24         So as I said, I'm very happy to go
25     through each and every individual thing,
```

```
                                             Page 127
 1                Proceedings
 2     which I was willing to do beforehand,
 3     but I could not because I was given the
 4     time limit of, Hey, you have to tell me
 5     by today at 5:00 whether you want a
 6     hearing or not.  So I couldn't actually
 7     take the time to go through -- which is
 8     what I wanted -- to go through and
 9     literally take each and every
10     highlighted area and show you and add
11     cases or papers or articles on it that
12     literally say the exact same thing.
13         Like, the generalizations -- like
14     he said that after he read the first --
15     after he read the first sentence, I
16     think, or, like, the very beginning of
17     my paper, that's when he was initiated
18     to see if this was an idea that was
19     written about before.  And I find it
20     very unfortunate -- fortunate that he
21     was intrigued enough to go and look at
22     it and see if anybody else had come up
23     with that strategy.
24         But I find it very unfortunate
25     that he only stopped at one because if
```

```
                                             Page 128
 1                Proceedings
 2     he had put that in the search bar, then
 3     he quickly could have clicked through a
 4     multitude of other cases that would
 5     say -- would sort of have the same
 6     thing, which is really surprising.
 7         And just as an example, I quickly
 8     did -- I did a quick search based on
 9     what he had said and I came up with
10     another arti- -- I guess I can use this,
11     if it's quick.  So just in response to
12     right here and right now, just based on
13     what he said --
14         PROFESSOR RIESMEYER:  Would you
15     like them to put it up --
16         MS. TSHUDY:  Oh, yeah, just so
17     it's easy for them to see.
18         Now, I took this and put it in my
19     Adobe just based on -- I don't know if
20     you heard him discussing the idea that
21     really intrigued him that he found was
22     super original or thought, which was
23     this data exclusivity grants.  And so if
24     you just get an idea, if you look at
25     this --
```

```
                                             Page 129
 1                Proceedings
 2         DEAN WILLIAMS:  Trisha, you might
 3     want to make that full size.  Let's make
 4     it full screen.
 5         MS. TSHUDY:  Okay.
 6         DEAN WILLIAMS:  Is that a little
 7     better for you?
 8         MS. TSHUDY:  Yes.  He was sort of
 9     grasping the idea that, I guess, I must
10     have searched this not necessarily on
11     where he said the mentioning of the very
12     first lines, but I can search that as
13     well if you'd like me to.  I didn't
14     think that that was even more important.
15     But I think this kind of gives an idea
16     of how this is not an unusual or
17     unwritten about topic.
18         So he actually kind of had the
19     indicator that I sort of took all these
20     articles that I read and instead of
21     choosing to write about tests or
22     processes because I think had gone
23     through the idea of dual patenting being
24     denied -- not dual patenting, no.  Yeah,
25     dual patenting being denied and trade
```





Page 130

```
 1           Proceedings
 2   secrets being an alternative to that.  I
 3   researched everything in regards to
 4   testing or methods or processes or
 5   procedures or the ability for them to
 6   patent the in-between stuff between
 7   products.
 8          So my paper was a culmination of
 9   all the results of all of those topics.
10   So it was more general than all these
11   specific papers, if that makes sense.
12   There's definitely specific things that
13   had been mentioned that I'd love to
14   address, but I would first like to hear
15   if you guys have any questions, and I
16   really hope you do, because I can
17   explain everything if you give me the
18   chance.
19          Go ahead.
20          ▇▇▇▇▇▇▇:  Okay, so I was an
21   English major in undergrad, so I don't
22   know anything about pharmaceuticals or
23   biotech.  Again, I'm sorry if it sounds
24   like I'm asking something silly, but I
25   am familiar with Turnitin.  And I am
```

Page 131

```
 1           Proceedings
 2   familiar with papers.  I've written a
 3   copious amount of papers in both --
 4   throughout undergrad and throughout my
 5   life.
 6          I'm a writer, so I look at this a
 7   little bit differently.  And something
 8   that really caught my eye, that was
 9   really unique is in the last page of
10   your paper, under Part 4 in the
11   conclusion, and in page 224 -- 244 of
12   Hannah-Alise Rogers' paper --
13          Dean Williams, would you mind
14   bringing that up?
15          DEAN WILLIAMS:  I'd be happy to.
16   I just need to find the right one,
17   and then I need to -- let me switch it
18   over.  What would you like?  The Law
19   Review?
20          ▇▇▇▇▇▇▇:  The Law Review.  Yes.
21          DEAN WILLIAMS:  Okay.  The Law
22   Review notes.  And what page?
23          ▇▇▇▇▇▇▇:  It's 244.
24          DEAN WILLIAMS:  This page right
25   here?
```

Page 132

```
 1           Proceedings
 2          ▇▇▇▇▇▇▇:  Scroll down a little
 3   bit.  Yes, perfect.
 4          So in that last paragraph that
 5   starts "Generic manufacturers,"
 6   Hannah-Alise Rogers is setting up for a
 7   conclusion.  And she goes, Generic
 8   manufacturers can protect her by
 9   equivalency custody created secret law,
10   and so on and so on.  And then she goes
11   on and lists it numerically.  She says,
12   Second, generic manufacturers can
13   withstand the threat of disclosure.  And
14   then, third, generic manufacturers can
15   address a threat arising from common
16   law, so on and so forth.
17          In Ms. Tshudy's conclusion, she
18   says, Information, in light, and then
19   the way that she structures it, from a
20   writer's perspective, it's a little bit
21   awkward because on the last page, it
22   says, out of nowhere, Third, generic
23   manufacturers can address the threat
24   arising from the common law of public
25   access, arguing that the purpose of the
```

Page 133

```
 1           Proceedings
 2   right is for the public to view the
 3   court as a legitimate question.
 4          So not only is this lifted, it
 5   appears verbatim, but it's not the
 6   tertiary point that you're making, so I
 7   just want to understand, like, why that
 8   choice stylistically.
 9          MS. TSHUDY:  It's not tertiary,
10   like, it's not the third one --
11          ▇▇▇▇▇▇▇:  It's not the third point
12   you're making.  You made four points
13   before that, so why does it say that
14   it's the third?
15          MS. TSHUDY:  Oh, yeah.
16          ▇▇▇▇▇▇▇:  Because when someone
17   lists their conclusion, it's like,
18   first, second.  First, I want to say
19   this.  Second, I want to say that.
20   Third, I want to say this, which is what
21   she does, but I don't see how that's the
22   third point.
23          MS. TSHUDY:  I mean, I suspect
24   that it was just an editing issue,
25   because this whole time -- like I said,
```



Page 134

```
 1                Proceedings
 2       I started with my general thing.  And if
 3   you look at my -- I think it was my
 4   original outline or my previous outline
 5   that had been the third, but then as I'm
 6   going through and adding and subtracting
 7   topics -- I mean, that's obviously a
 8   mistake, and, again, these are like the
 9   small things that I do not -- I am not
10   unwilling to recognize issues, I guess,
11   or mistakes that I made.
12       And I openly admitted that
13   initially, looking at everything, I
14   really got super concerned that I did
15   something that was plagiarism or such.
16   And then this was just, looking through
17   everything, what I've been able to come
18   up with, knowing that I did not read
19   through her paper or copy stuff over.
20   So I can't say for sure, but I don't
21   know if you experienced that.
22       But sometimes when I'm trying to
23   balance out what I include, I will add
24   or subtract topics insights and
25   rearrange them, but they're always
```

Page 135

```
 1                Proceedings
 2   presented in the same order, if that
 3   makes sense.  So depending on which, you
 4   know, background paper that I could have
 5   included in the footnotes, which again,
 6   he affirmed that that's an option and
 7   stuff, I did not have that much time.
 8   They tend to go in the same orders.
 9       It just varies -- it varies which
10   ones are included by each paper, but
11   they're always in the same order.  So as
12   I'm going through my paper and deciding,
13   adding or subtracting things, which is
14   again a big part of why, even in my
15   presentation, I didn't harp on the
16   Amstar stuff overly, was part because
17   that wasn't what he specifically asked
18   me to look into.
19            ███████:  I just want to be
20   concise.
21            MS. TSHUDY:  Oh, sorry.
22            ███████:  Substantively -- and
23   please, Professor Gould, correct me if
24   I'm wrong -- it doesn't look different
25   from what Hannah-Alise Rogers is saying,
```

Page 136

```
 1                Proceedings
 2   is it not?
 3            DEAN WILLIAMS:  So here's
 4   Hannah-Alise Rogers' conclusion.  She
 5   starts with, Generic manufacturers can
 6   protect their bioequivalency tests
 7   through trade secret law by overcoming
 8   obstacles in three potentially
 9   threatening contexts.  She says,
10   Disclosure by FOIA of trade secrets,
11   and, Constitute commercially valuable
12   information.
13            Second, Generic manufacturers can
14   withstand the threat of disclosure to
15   the FDA's own use of the information by
16   again arguing that a bioequivalency test
17   constitutes a trade secret under the
18   specific FDA definition and by showing
19   positive steps taken to treat the
20   information as a secret meeting the
21   second circuit test.
22            Third, Generic manufacturers can
23   address the threat arising from the
24   common law right of public access by
25   arguing that the purpose of the right is
```

Page 137

```
 1                Proceedings
 2   for the public to view the court as a
 3   legitimate institution and that this
 4   purpose would be defeated if the court
 5   disclosed on the manufacturer's
 6   extremely valuable information to
 7   competitors.
 8            Now let's look at Trisha's.  So,
 9   the emerging issues include the threat
10   of disclosure from FOIA, was the first
11   thing, that can be prevented by proper
12   compliance with the definition set forth
13   by the statute and agency, the threat of
14   disclosure by the FDA's own use of
15   information by limiting it through the
16   second circuit three mark test, and then
17   this exact same language.
18            Third, generic manufacturers can
19   address the threat arising from the
20   common law right of public access by
21   arguing that the purpose of the right is
22   for the public to view the court as a
23   legitimate institution and that this
24   purpose would be defeated if the court
25   disclosed a manufacturer's extremely
```



```
                                              Page 138
 1              Proceedings
 2   valuable information to competitors.
 3         ▇▇▇▇▇: So this is a bit jarring
 4   to me, not only because it's lifted
 5   verbatim, word-for-word, but because
 6   there doesn't seem to be any difference
 7   between this conclusion and the
 8   conclusion that Hannah-Alise Rogers is
 9   making.  And there are parts of the
10   paper where I can actually hear your
11   voice, like there are errors -- and I'm
12   not saying that to criticize you.
13   That's a good thing.  That means that I
14   know that you wrote it.
15         And, like, for instance, on -- I
16   believe, sorry.  Let me get this page
17   number right.  Let's see, 1st, 2nd --
18   it's the 6th page.  It starts, As
19   improper patent writing --
20         DEAN WILLIAMS:  I'm sorry, which
21   page?
22         ▇▇▇▇▇:  Yes, it's right there.
23         PROFESSOR BUTLER:  On Trisha's
24   paper.
25         DEAN WILLIAMS:  On Trisha's
```

```
                                              Page 139
 1              Proceedings
 2   paper -- where are you looking?
 3         ▇▇▇▇▇: It's, As in -- the next
 4   paragraph.  The first sentence.  So
 5   that's an incomplete sentence.
 6         MS. TSHUDY:  Yeah.  There was
 7   supposed to be a comma in there, yeah.
 8         ▇▇▇▇▇: And then if you scroll
 9   further down a little bit more, I think
10   you can see somewhere where it says, The
11   court -- I think you have to scroll down
12   a little bit more.  Yes, right there.
13   The court explained that -- the court
14   explained that litigation is more
15   feasible than believed.
16         I think you meant to write
17   "previously believed," but when I'm
18   hearing this paragraph, it looks like
19   you're writing, it looks like your
20   email.  But when I'm looking at the
21   parts of the paper that are highlighted,
22   I cease to hear your voice and that's
23   what concerns me.  And I just wanted to
24   hear your explanation regarding that.
25         MS. TSHUDY:  I mean, the biggest
```

```
                                              Page 140
 1              Proceedings
 2   thing is that whenever it came to things
 3   that were, like, introductions or
 4   conclusions, those tend to be even more
 5   so things that are -- this was a really
 6   hard subject to create something
 7   completely unique and original about.
 8   But this was from the beginning what
 9   fascinated me, I guess, and brought this
10   forward.
11         But it's annoying because I made
12   last minute changes, that I should have,
13   but normally my introduction and
14   conclusion should be the most looked at
15   and clear and concise of my entire
16   paper, if that makes sense.  So I'm
17   actually disappointed in myself, sort
18   of, that it failed.  But, yeah.
19         ▇▇▇▇▇: But the language that's
20   lifted verbatim, word-for-word, what is
21   your explanation behind that?
22   Especially like, in the conclusion
23   because that is word-for-word, there's
24   almost no difference.
25         MS. TSHUDY:  Literally.  I'm going
```

```
                                              Page 141
 1              Proceedings
 2   to try to look this up real quick, but
 3   my honest-to-goodness idea is that these
 4   aren't that unique of conclusions.  I
 5   honestly thought that my paper would be
 6   considered generic, so it literally is
 7   just general -- I have no idea how it
 8   would be, like -- any instances that are
 9   claimed to be, you know, word-for-word.
10   That is, again, why I was literally
11   talking to Dean Williams and believing,
12   like, I don't even understand how that
13   could ever be possible.
14         And if I made any mistakes
15   thinking that some notation that I had
16   in my -- like, while I was putting this
17   together, would have been from something
18   else.  I just don't think that that is
19   really -- obviously, I've never made
20   that mistake before, so I wouldn't
21   expect it, but that would definitely not
22   be intentional in any way.
23         But I also would like to even look
24   at whether these topics are literally
25   just so -- like, for instance, The
```



```
                                          Page 142
 1              Proceedings
 2     common law right to public access --
 3     like exactly what this one sentence in
 4     particular looks at.  There are entire
 5     papers written about that.  You know
 6     what I mean?
 7              ▮: But if there were entire
 8     papers, wouldn't your peers have the
 9     similar conclusion or the similar --
10     like, if that idea was so widespread and
11     cornerstone, I feel like it would be
12     apparent in the work of your peers, but
13     it is uniquely apparent in your work.
14     Do you get what I'm saying?
15              MS. TSHUDY:  Yes.
16              ▮: The fact that it's
17     word-for-word, it's very, very jarring.
18              MS. TSHUDY:  Yes.  Agreed.
19              ▮: I'm familiar with
20     Turnitin.  As English majors, we got to
21     see our own work in Turnitin.  And so
22     what would happen is, like, universities
23     typically have a percentage threshold,
24     and sometimes you can have percentages
25     come up that are like 60%, 80% and have
```

```
                                          Page 143
 1              Proceedings
 2     the paper not be plagiarized, right,
 3     because sometimes Turnitin is not as
 4     conservative or will fail to realize
 5     that you've actually cited your sources.
 6              But to see 59% on an originality
 7     report and then to see the words listed
 8     word-for-word, that is also a very
 9     jarring thing.  And I just want to give
10     you a chance to explain that.
11              And I'm not saying this to attack
12     you in any way, shape or form, but I'm
13     giving you, like, a window into my head
14     because if I was in your shoes, I would
15     also want to know what I was thinking.
16     And this is what concerns me the most,
17     because I believe you that, maybe, you
18     didn't have malicious intent when you
19     were doing this, but you can still
20     plagiarize without meaning to do it.
21              DEAN WILLIAMS:  May I also just
22     make one point about the Turnitin?  I
23     excluded all sources when I was doing
24     this Turnitin comparison.  I excluded
25     all sources except the Law Review note
```

```
                                          Page 144
 1              Proceedings
 2     of Hannah-Alise Rogers.  And similarly
 3     when I did the comparison -- so this Law
 4     Review note is only compared against
 5     Ms. Tshudy's paper, and Ms. Tshudy's
 6     paper is compared only against the Law
 7     Review note.
 8              I did a full Turnitin and it was,
 9     to your point, ▮, not particularly
10     helpful.  So this is just these two
11     papers being compared against one
12     another in Turnitin.  There are no other
13     sources being used.
14              MS. TSHUDY:  My biggest thing to
15     that was -- sorry, now I'm forgetting
16     because you kept talking.  What was your
17     response specifically to me explaining
18     that this is like --
19              ▮: How are the words
20     exactly the same?  I just want to know
21     how words -- your conclusion is exactly
22     the same.
23              And the reason I'm looking at the
24     conclusion, and actually disregarding
25     the other end of the paper is because
```

```
                                          Page 145
 1              Proceedings
 2     that should be your summary.  Like, that
 3     should be the meat of your paper.  So I
 4     want to know how that is so similar to
 5     Ms. Rogers' paper.
 6              MS. TSHUDY:  And I wish I could
 7     tell you exactly.  And I suspect that
 8     when it came to things like developing
 9     my introduction and conclusion, then I
10     don't -- again, the one thing that I'm
11     willing to admit to regarding the note
12     is that I would have read just enough to
13     kind of get a general, you know, idea
14     from it and then just the research.  The
15     only thing I actually took down was the
16     resources and stuff.
17              So I don't know if this has any
18     tie into not realizing -- but I didn't
19     copy and paste any of her work other
20     than copying and pasting it to my
21     outline for him to review, so I have no
22     idea how I could have said that.  I
23     think I can find an article -- something
24     else that has it almost the same --
25              ▮: You said that you read
```



```
                                                    Page 146
 1                  Proceedings
 2     "enough" of the note.  But, like, what
 3     does that mean?  How do you, like, go
 4     about looking at your sources?
 5             MS. TSHUDY:  Oh, read enough of
 6     the note?
 7             ▓▓▓▓▓:  Yeah, you said that --
 8             MS. TSHUDY:  Yeah, so whenever you
 9     do secondary sources -- like when I do a
10     secondary source search, obviously
11     there's just like whichever trigger --
12     all of the wording and stuff, like all
13     of the words that I add in my search
14     bar.  But also are they, like,
15     culminated close enough to each other
16     that they're at least, like, sort of,
17     combined -- if that makes sense -- sort
18     of combined to each other and stuff.
19     Just to make sure with topics like this,
20     where there's so many options given
21     to -- everything to, like, look through
22     and stuff, I sort of choose sources that
23     at least --
24             Well, this source came up in the
25     very beginning of researching.  So two
```

```
                                                    Page 147
 1                  Proceedings
 2     sources that sort of come close into
 3     what I might be interested in writing
 4     about or might something that might be
 5     fascinating.
 6             ▓▓▓▓▓:  Do you read the whole
 7     thing or do you do, like, do you skim
 8     it?  Because what I do when I research
 9     is, like, I typically will read the
10     whole thing when I read a source because
11     I don't want to make any errors.  I want
12     to parse my sources.  So are you reading
13     the whole thing or are you skimming
14     into --
15             MS. TSHUDY:  I did not read the
16     whole thing, and if that really works
17     better -- like I said, I normally don't
18     want to read the whole thing because I
19     don't want to see how they analyze stuff
20     because I don't want it ever to be
21     thought of that I copied stuff.
22     Normally -- that hasn't failed me yet.
23             But, obviously, if you find it
24     actually better to do the complete
25     opposite, then I'm completely open to
```

```
                                                    Page 148
 1                  Proceedings
 2     changing my processes to make sure that
 3     this never happens again.  This is a
 4     nightmare.  But, yeah, if that makes
 5     sense.  I purposely don't read it
 6     because I feel like that is more
 7     dangerous to leading to copyright issues
 8     than reading it.  But if you are
 9     assuming the opposite, then that's
10     actually more interesting.
11             ▓▓▓▓▓:  Do you have --
12             MS. TSHUDY:  I've never actually
13     heard that before.
14             ▓▓▓▓▓:  I just want to be clear.
15     Did you come across this actual source
16     when you were doing your research?
17             MS. TSHUDY:  Did I come across the
18     note?
19             ▓▓▓▓▓:  This paper.  This
20     specific paper?
21             MS. TSHUDY:  Yes.  And it was
22     included on my underside of my outline,
23     but I came across it, like, literally
24     within less than an hour, probably
25     minutes before meeting with him for my
```

```
                                                    Page 149
 1                  Proceedings
 2     outline.  And in his description, it
 3     said that we can include possible
 4     sources if we wanted to talk about them
 5     being like, a possible inclusion.
 6             ▓▓▓▓▓:  But if you came across
 7     this paper, then why isn't it in your
 8     end notes or like, in your footnotes?
 9             MS. TSHUDY:  Because I couldn't
10     find -- because I couldn't find anything
11     that is specifically -- well, so this
12     might be a mistake or something because
13     I didn't look in depth.  I didn't have
14     anything that I had read from the paper
15     and specifically pulled from the paper
16     to put in my information, if that makes
17     sense.
18             Like, all this stuff can be pulled
19     from different ones, otherwise I would
20     have happily done it.  But again, I
21     asked him if you could just default
22     include stuff, you know.  And I said, is
23     it like the sample paper?  Because the
24     sample paper was very specific.
25             DEAN WILLIAMS:  Can I just --
```



```
                                        Page 150
 1                  Proceedings
 2          MS. TSHUDY:  And so that's exactly
 3    what I used.
 4          DEAN WILLIAMS:  So here's the
 5    sample paper.  Just to put everybody's
 6    mind at ease about what this sample
 7    paper is.  This is the sample paper
 8    that --
 9          Is this, Professor Gould, is this
10    the sample paper that you provided to
11    your students?
12          PROFESSOR GOULD:  Yeah, it looks
13    like the one I posted in Canvas at the
14    beginning of the semester.
15          DEAN WILLIAMS:  So this sample
16    paper -- Professor Butler, may I ask
17    Professor Gould some questions about
18    this sample paper, please?
19          PROFESSOR BUTLER:  Please do.
20          DEAN WILLIAMS:  So, Professor
21    Gould, this is the sample paper that you
22    provided to your students -- for what
23    purpose?
24          PROFESSOR GOULD:  So they can have
25    just some idea -- at one of these
```

```
                                        Page 151
 1                  Proceedings
 2    workshops on teaching that we do at
 3    Dickinson Law, when I was just starting
 4    to be an adjunct, it was recommended
 5    that you could post, to the students, a
 6    sample paper.  I asked one of the
 7    professors, Lance --
 8          DEAN WILLIAMS:  If excuse me,
 9    which professor?  Professor Cole.
10          PROFESSOR GOULD:  Professor Cole.
11    Yeah, actually, you had mentioned I
12    should -- Professor Cole.
13          DEAN WILLIAMS:  I actually found
14    that email.
15          PROFESSOR GOULD:  Yeah, I asked
16    you.  You recommended I talk to
17    Professor Cole and Professor Cole sent
18    this is one that's used at Dickinson
19    Law.  It's just to provide some sample.
20          DEAN WILLIAMS:  So table of
21    contents.
22          PROFESSOR GOULD:  Right.
23          DEAN WILLIAMS:  You know, sort of,
24    what we're doing is indemnification in
25    advance -- a title, the introduction,
```

```
                                        Page 152
 1                  Proceedings
 2    footnotes.  And were you specific that
 3    students needed to include footnotes at
 4    the bottom of the page, or were you okay
 5    to have students include their footnotes
 6    at the end?
 7          PROFESSOR GOULD:  I was definitely
 8    okay to have them at the end and I made
 9    that clear that they could do either
10    one.
11          DEAN WILLIAMS:  Trisha, do you
12    have questions about this sample paper?
13          MS. TSHUDY:  No.  And I sent this
14    specific -- I actually sent this to you.
15    I don't know if you got it a different
16    way as well, but I remember I emailed
17    this directly to you when this first
18    came up.
19          DEAN WILLIAMS:  So this is -- I
20    don't believe you did, but that's okay.
21    This is the sample paper that Professor
22    Gould provided to the students in
23    Biotech Pharmacy -- or pharmaceuticals
24    and the law.
25          MS. TSHUDY:  And so the end --
```

```
                                        Page 153
 1                  Proceedings
 2    instead of it having like a collection
 3    of resources or anything that could
 4    possibly be connected, it just has what
 5    you can directly, like -- sub-scripters.
 6    Well, I guess it's not, in the end,
 7    because I asked him that as well.  He
 8    said he clarified that, that was after I
 9    asked him that question about whether we
10    had to have it at the bottom of the page
11    because that created formatting issues.
12          And he said, no, we could have at
13    the end and then he clarified it in
14    class based upon my question.  And so it
15    was just that if there were things that
16    I had read for background information,
17    it doesn't leave room for me to just
18    include those things.  And there's like
19    a lot that I read for background or
20    general knowledge or just to get an idea
21    about what to write about that I wasn't
22    able to include because I couldn't cite
23    them as a resource to a particular
24    sentence or a particular aspect or
25    anything like that.
```



Page 154

```
 1               Proceedings
 2         There are, you know, papers that I
 3   read where I actually read the entire
 4   thing and stuff, and I still couldn't
 5   cite it, but obviously I didn't take
 6   anything from them or anything like
 7   that.  So that was something I
 8   specifically clarified him because my
 9   default, especially from Bio-Chem
10   undergrad and stuff, is that you mention
11   things that literally could have
12   influenced your ideas or led to your
13   ideas or anything that you could have
14   drawn upon, intentionally or not, just
15   to make sure that people knew that you
16   were giving them credit for that.  And
17   that's never been an issue.
18         I feel like that citations
19   actually -- it's a relief for students
20   because you get to administer credit to
21   other people for stuff, you know, and
22   it's not like anything that you have to
23   feel like -- you're not trying to dodge
24   and weave between what other people have
25   concluded, if that makes sense.
```

Page 155

```
 1               Proceedings
 2         PROFESSOR BUTLER:  Trisha, when
 3   you write a paper --
 4         MS. TSHUDY:  Yes.
 5         PROFESSOR BUTLER:  I may be
 6   putting too much weight on some of the
 7   words that are being used.  Do you
 8   actually work with a blank screen and
 9   type in each word yourself or do you
10   literally cut and paste and copy from
11   other sources?
12         MS. TSHUDY:  I don't copy and --
13   okay, cases.  Cases -- if I'm quoting an
14   exact case, I'll copy and paste from
15   quotations -- from the exact thing.
16         PROFESSOR BUTLER:  Right.
17         MS. TSHUDY:  But then I normally
18   set that right away.
19         PROFESSOR BUTLER:  If it's not a
20   quotation, you don't.
21         MS. TSHUDY:  If it's not a
22   quotation, I don't -- copy and paste?
23         PROFESSOR BUTLER:  You've been
24   shown software which indicates there's
25   verbatim reproduction of a lot of
```

Page 156

```
 1               Proceedings
 2   language.  Is it just copied by typing
 3   individually or was it copy and paste?
 4         MS. TSHUDY:  I haven't necessarily
 5   looked to check.  I would be very
 6   astonished if things are verbatim, but
 7   it would not be copied and pasted from a
 8   separate source.  I suspect -- well,
 9   literally the only possible explanation
10   is if these things got worked into my
11   outline and somehow got separated from
12   the citation, which is normally
13   immediately afterwards, and I thought
14   that I -- literally that that was just
15   something that I had written, if that
16   makes sense.
17         Like if it snuck into my outline,
18   which normally doesn't ever happen --
19   and I'm more than willing to admit that
20   if I was going to make mistakes in any
21   semester ever, it would probably be this
22   one, just because of the tragedy that I
23   went through and everything.  But again,
24   there is no way that it would ever come
25   straight from a source or anything.
```

Page 157

```
 1               Proceedings
 2   Like the only way that could ever be
 3   possible is if I wrote it down, if I had
 4   it within an outline or resources or
 5   something, and it somehow got misplaced
 6   or had some accidental deletion of the
 7   citation right next to it, and I
 8   literally thought that I would have
 9   written it.
10         That is the only time.  Like I
11   would never even risk anything of this
12   sort.  And again, it's never happened to
13   me, teachers have never questioned stuff
14   like that.  Especially when it's
15   something that -- I have to say, it's
16   even more likely to happen when it's
17   something that is something that I've
18   read in so many papers and looks like my
19   just, kind of, like, summarization of
20   background material.  So especially if
21   it's something where it's not, like,
22   obviously from somebody else or anything
23   like that, if that makes sense.
24         DEAN WILLIAMS:  Trisha, I'd like
25   to ask you a question.
```



```
                                              Page 158
 1                 Proceedings
 2          MS. TSHUDY:  Okay.  Go ahead.
 3          DEAN WILLIAMS:  I want to look at
 4   page 11 of your paper, which -- I'm
 5   sorry, folks, I'll get to the right
 6   page.
 7          Would you please read -- this is
 8   your paper.  Will you please read that
 9   entire paragraph?
10          MS. TSHUDY:  The first factor
11   considers whether the documents were
12   judicial documents to which the public
13   had a right of access.  Properly
14   presented, the manufacturer could
15   possibly end the inquiry here.  The
16   definition of judicial documents, as
17   discussed in part 2C, is relevant.
18   Documents which are submitted to and
19   accepted by a court of competent
20   jurisdiction in the course of agitatory
21   proceedings and become documents to
22   which the presumption of public access
23   applies.  Therefore, the documents with
24   the relevant trade secret information
25   must be requested or submitted by the
```

```
                                              Page 159
 1                 Proceedings
 2   court in order for the definition to
 3   apply.  The necessity of inclusion is
 4   unlikely unless the lawsuit concerns the
 5   method contained within the trade secret
 6   itself.
 7          DEAN WILLIAMS:  Okay.  So in this
 8   you refer to part 2C, can you help me
 9   understand what that references to?
10          MS. TSHUDY:  I think I had that
11   written as an example.  I think that was
12   sent to me, but then it was -- he sent
13   that to me over email, and it was
14   scratched out, so I wasn't able to
15   actually see what it said.
16          DEAN WILLIAMS:  Well, let's go to
17   the Law Review article.
18          MS. TSHUDY:  Yeah.
19          DEAN WILLIAMS:  I'd like you to
20   start reading right here, looking at --
21   Looking at the first factor.  This is
22   page 236 of the Law Review note.  Would
23   you read that?
24          MS. TSHUDY:  Looking at the first
25   factor, one of the documents were
```

```
                                              Page 160
 1                 Proceedings
 2   judicial documents to which the public
 3   had a right of access.  A manufacturer
 4   could likely (inaudible).  The
 5   definition of judicial documents that is
 6   discussed in part 2C is relevant.
 7   Documents which are submitted to and
 8   accepted by a court of competent
 9   jurisdiction in the course of agita- --
10   sorry -- proceedings and become
11   documents to which the presumption of
12   public access apply.
13          Do you want the whole thing?
14          DEAN WILLIAMS:  Keep going.
15          MS. TSHUDY:  Thus the only way
16   that the definition would apply is if
17   the documents with relevant trade secret
18   information were requested by or
19   submitted to a court, which is not
20   like --
21          DEAN WILLIAMS:  Probably likely.
22          MS. TSHUDY:  -- to be necessary
23   unless the lawsuit concerns the
24   bioequivalency test method itself.
25          DEAN WILLIAMS:  Okay.  So how come
```

```
                                              Page 161
 1                 Proceedings
 2   this copies exactly that same -- how do
 3   you explain that you refer to part 2C,
 4   that you don't know what that means,
 5   when it's the same in this law review
 6   note?
 7          ▮▮▮▮▮▮▮▮▮▮:  Can I get another
 8   water bottle.
 9          DEAN WILLIAMS:  Can you get
10   another what?
11          ▮▮▮▮▮▮▮▮▮▮:  Water bottle?
12          DEAN WILLIAMS:  Yes.  When we
13   break after this, I'll get you more too.
14          I'm going to just move on because
15   I think the next -- I'd like you to read
16   this next paragraph right here.  Just
17   read it out loud.
18          MS. TSHUDY:  What, me?
19          DEAN WILLIAMS:  Yes, you.  If you
20   would read this next paragraph out loud.
21          MS. TSHUDY:  In addition, even if
22   a court does request documents
23   containing trade secrets, generic
24   manufacturers could argue against
25   disclosure based on the theory behind
```



Page 162

```
 1              Proceedings
 2     the common law right itself.  For
 3     example, the goal of this doctrine of
 4     the right to public access is to portray
 5     the court as a legitimate and
 6     independent body that can be trusted,
 7     respected -- and respected, then the
 8     disclosure of the document upon which a
 9     manufacturer has built its business
10     could be harmful to the court's
11     reputation.  Inventors, manufacturers,
12     and producers of lucrative goods would
13     hesitate to turn to the court's for a
14     remedy if the court would simply
15     disclose the trade secrets to the first
16     person who asks.
17           DEAN WILLIAMS:  Okay.  So that
18     whole paragraph is not cited at all.
19     There is nothing in that paragraph that
20     cites to any other primary source.  Do
21     you agree with me?
22           MS. TSHUDY:  Yes.
23           DEAN WILLIAMS:  You see no
24     footnoting?
25           MS. TSHUDY:  Yes, I agree.
```

Page 163

```
 1              Proceedings
 2           DEAN WILLIAMS:  Okay.  So now
 3     let's look at your paper.  Can you read
 4     this paragraph right here?
 5           MS. TSHUDY:  In addition, even if
 6     the court does request documents
 7     containing trade secrets, generic
 8     manufacturers could argue against the
 9     disclosure based on the theory behind
10     the common law right itself.  For
11     example, if the goal of this doctrine of
12     the right to public access is to portray
13     the court as a legitimate and
14     independent body that can be trusted and
15     respected, then the disclosure of a
16     document upon which a manufacturer has
17     built its business could be harmful to
18     the court's reputation.  Inventors,
19     manufacturers, and producers of
20     lucrative goods would hesitate to turn
21     to the courts for a remedy if the Court
22     would simply disclose their trade secret
23     to the first person who asked.
24           DEAN WILLIAMS:  Okay.  So you
25     agreed with me, right --
```

Page 164

```
 1              Proceedings
 2           MS. TSHUDY:  Yes, yep.
 3           DEAN WILLIAMS:  -- that this is a
 4     conclusion in the Law Review note,
 5     right?  No citations, no primary
 6     sources.
 7           You also agree, you read this, it
 8     is identical to this photograph, and in
 9     no way do you cite to this conclusion in
10     Ms. Rogers' paper.  How is it that if
11     you never read Ms. Rogers' paper, you
12     could copy her language word-for-word?
13     Her conclusion, word-for-word?  Her
14     original work, word-for-word?  How could
15     you do that?
16           MS. TSHUDY:  I mean, I read
17     different parts of it -- and, again, you
18     brought this up initially and stuff, and
19     I explained this right afterwards that
20     this would be the most difficult thing
21     for me to understand.  And that,
22     honestly, it has to guarantee that I
23     definitely made a mistake somewhere in
24     making sure that my citations matched up
25     with everything.  Particularly when it
```

Page 165

```
 1              Proceedings
 2     comes to the public access, there are so
 3     many papers that were written
 4     specifically about this that I honestly
 5     mistook this, somehow, in my list of --
 6     from my outline, not from her paper --
 7     in my list, from my outline, from my
 8     writing.
 9           So I have no idea how I separated
10     the citation that I put at the end of
11     it.  I have no idea how that could have
12     ever possibly happened.  And, again, I'm
13     not trying to cover up this.  And this
14     is exactly why citations are so
15     important and why it's, like, a massive
16     issue.  And why, when you first talked
17     to me about this was I'm trying to
18     figure out -- like, I can't explain
19     this.
20           So the question was -- so that's
21     why I literally asked you, does there
22     have to be some sort of mens rea
23     regarding plagiarism or is there any
24     room for a simple mistake.  Like a
25     simple, complete unknowingly,
```



Page 166

```
 1                Proceedings
 2   unintentional mistake where I read so
 3   many papers on public access pertaining
 4   to trade secrets and based on this issue
 5   that I literally thought that this was a
 6   paragraph in my outline that I read
 7   myself and somehow misplaced the
 8   citation that was right after it
 9   because, obviously, I would have never
10   even never included it.
11          And again, the biggest thing is I
12   had this entire paper included in my
13   outline, so there was never any attempt
14   to conceal that.  And I knew full
15   well -- well, I, actually, in my mind, I
16   knew full well that Professor Gould knew
17   of this paper because in my mind, he saw
18   it during my outline.  And so I didn't
19   even think that it was going to be like
20   a Google kind of search or whatever.
21          PROFESSOR RIESMEYER:  Dean
22   Williams, I have a question about the
23   Turnitin.  The last page, it says 59%
24   similarity index.  Does that mean 59% of
25   Ms. Tshudy's paper is the same as the
```

Page 167

```
 1                Proceedings
 2   law review article?
 3          MS. TSHUDY:  Yes.
 4          PROFESSOR RIESMEYER:  Okay.  And
 5   do you know what the other percentages
 6   are?  57, 56 and 10, what they mean?
 7          DEAN WILLIAMS:  Actually, let me
 8   look at that again.
 9          PROFESSOR BUTLER:  While you're
10   looking at that -- Ms. Tshudy, because I
11   understand that you're telling us,
12   initially, that you did not read the law
13   note except for possibly for some of the
14   footnotes.  Now, you're telling us that
15   it's possibly part of your outline,
16   which means you must have read it
17   because you put the paragraph into your
18   outline.
19          MS. TSHUDY:  Well, no, I never
20   read it through, especially the analysis
21   and everything.  So I don't know if this
22   was just somehow brought over because I
23   was trying to -- because I read so many.
24          PROFESSOR BUTLER:  If it was
25   brought over, was it by cut and paste?
```

Page 168

```
 1                Proceedings
 2          MS. TSHUDY:  Not into my paper,
 3   no.  But into my second outline that was
 4   separate from the first one that I
 5   presented to him, where I was trying
 6   to -- where I would take, you know,
 7   ideas that I felt were, sort of,
 8   important or kind of what I was also
 9   grasping.  And especially for this,
10   there were so many different people,
11   including this, in different words,
12   that -- ideally, I would take those and
13   try to make sure that I didn't do a
14   single one of them and kind of create my
15   own that avoided copying over other
16   people's.
17          And this is the exact opposite of
18   what the intention of that is,
19   because -- there are so many paragraphs
20   that I read that are almost exactly the
21   same as this.
22          PROFESSOR BUTLER:  None of them
23   are saved.  Not one of them.
24          MS. TSHUDY:  Okay.  Yeah.  I think
25   the biggest thing is understanding
```

Page 169

```
 1                Proceedings
 2   what -- I normally choose very unique
 3   topics because I don't want to have to
 4   dance around sources and stuff.  So I've
 5   never had to really deal with
 6   understanding what is considered a
 7   generalization -- and this is just
 8   something that I suppose -- to me, I
 9   believe was a generalization that I had
10   made just because so many different
11   people had made those same conclusions.
12   They're nonspecific draws.
13          So it was just something that I
14   messed up from my own work, but
15   completely unintentional.  And like I
16   said, I had mentioned this.  As soon as
17   she mentioned that this was something
18   that had happened, that obviously it
19   must be a mistake and that there was
20   never any intention to steal anything
21   from this note, if that makes sense.
22          PROFESSOR BUTLER:  Dean Williams,
23   do you have a response?
24          DEAN WILLIAMS:  I do have a
25   response to Professor Riesmeyer.  So,
```



Page 170

Proceedings

I'm sorry, I misspoke. The 59% similarity index is versus every source, but then if you look at the digitalcommons.law.uga underneath that and it says 49. 49% of this paper is an exact match of the law review notes.

PROFESSOR BUTLER: Professor Gould.

PROFESSOR GOULD: It's okay. I'll wait.

DEAN WILLIAMS: No, go ahead.

PROFESSOR GOULD: There are a few things I really have to respond to. I can do it later, too.

PROFESSOR BUTLER: It's a good time now. Go ahead.

PROFESSOR GOULD: All right. Just a couple of things. Just to correct the record.

If I heard it right, Ms. Tshudy, at one point seemed to indicate some disappointment. She thought that after reading just the first few sentences of her paper, I ran and did a Google

Page 171

Proceedings

search, but I hope it's clear that I was very familiar with Ms. Tshudy's paper at the time. And then when I found the Rogers' note, it was in the Rogers' note, the first thing I noticed was the first couple of sentences. So I don't want to make it seem like I jumped to some Google search after hearing just two lines. That's way it sounded, so I need to correct that.

On this outline that I now see has mention of the Momenta case, just to be clear -- I think maybe Dean Rogers found that the outline that was sent had like, 70 plus pages. The outlines students were supposed to send would be like two to three pages. And that's what everyone's done this term and, you know, previous term.

So Ms. Tshudy, the outline she sent me, in like October, had two or three pages of outline, but then had 70 plus pages of just sort of random material -- I'll just call it material.

Page 172

Proceedings

I think it's probably cut-and-paste, but I'll just -- material. And I do not recall seeing that case at the bottom, near the bottom of the 70 pages. I just wanted to clarify the record of that. I'm pretty confident that I did not see -- at the time, I think I saw 70 plus pages. If she's sending me some collection of material, I'm not going through it all. So I was not aware of the Momenta -- sorry -- of the Rogers' article until I did that Google search in December.

And just two other things, real quick. On the selection of topics, you know, these are topics that Ms. Tshudy selected for herself. The Right to Try, as I recall, right from the beginning, she selected that for her slide presentation. And then for the paper, early on, if I can remember, something about entrepreneurial aspects of biotech, something like that. And I didn't reject it. I just said, Oh, if

Page 173

Proceedings

you want to do that just -- I said something like, just make sure it doesn't look like a whole business case, you know, make sure it's a law school paper. So I did not reject it. These are topics she selected.

And then last thing is this discussion how I was very interested in the litigation sector. I was also interested in the trade secret part and discussions, I remember, were mainly to do with the manufacturing process. This is a thing that's not only discussed by scholars, but real-life attorneys in our practice. This is the hot area that's still actively discussed today, trying to weigh and strategize with manufacturing processes, making the biomolecules, what to go after trade protection versus what to patent.

And the reason I wanted to bring that up, first of all, the example, the paper -- or some article that Ms. Tshudy briefly put up, at least in the little



Page 174

```
 1              Proceedings
 2   we saw, we just saw a couple of -- not
 3   the sample paper.  The one the
 4   Ms. Tshudy -- we only saw like a couple
 5   of paragraphs, I guess.
 6         DEAN WILLIAMS:  The one that
 7   Trisha put up.
 8         PROFESSOR RIESMEYER:  I don't
 9   think you have --
10         DEAN WILLIAMS:  I don't have that.
11         PROFESSOR GOULD:  If you want to
12   look at it, we can.  But from the little
13   we saw, it looks like it focuses on
14   manufacturing processes.  I know this is
15   getting a little technical, but that was
16   what I remember of these discussions.
17   So another reason, having not seen the
18   Rogers' paper until December when I did
19   the Google search.  This was interesting
20   and new to me that someone would focus
21   on the testing for FDA submission.
22         And that goes to the conclusions.
23   And we had some dialogue earlier, we
24   were sort of parsing through, trying to
25   see if there was something novel about
```

Page 175

```
 1              Proceedings
 2   Ms. Tshudy's paper and I tried to parse
 3   this and noted that she took out the
 4   word "bioequivalency" and putting in
 5   "testing methods."
 6         But now that we've gone through
 7   all this, it has, mind you, very good
 8   observations about the conclusion.  In
 9   my view, that takes nothing away from my
10   view that it's the same basic thesis.
11   And in the conclusion, everything was
12   said, years, right, and the focus on a
13   viable alternative, you know, that
14   phrase, that was interesting and I had
15   not seen before.
16         So I just wanted to clear the
17   record on that.
18         PROFESSOR BUTLER:  Thank you.
19         DEAN WILLIAMS:  I have a few
20   additional questions, but , go
21   ahead.
22         _____:  Okay.  I was seeing
23   some questions, and it's -- just to
24   clarify, am I able to ask anybody at
25   this point?  Or is it just --
```

Page 176

```
 1              Proceedings
 2         DEAN WILLIAMS:  You can ask
 3   anybody, go ahead.
 4         _____:  Okay.  So just
 5   clarification.  And it might seem like
 6   little random things on the side, but --
 7   so you mentioned that you received an
 8   email and you were given how many hours
 9   to respond?
10         MS. TSHUDY:  Okay.  I'll check
11   that right now.
12         _____:  I believe you said at
13   5:00 or by 5:00 that day, but how long
14   was that?
15         MS. TSHUDY:  Let me check on that.
16         DEAN WILLIAMS:  I can help you
17   with that, _____.
18         MS. TSHUDY:  Sorry, am I taking
19   too long?
20         _____:  Whoever --
21         MS. TSHUDY:  I think she talked to
22   me --
23         DEAN WILLIAMS:  I'll send it to
24   you.
25         Here's the email that I sent.  So
```

Page 177

```
 1              Proceedings
 2   I asked her what sample paper she was
 3   referring -- but I sent her an email on
 4   Tuesday, January 4, at 12:02 p.m.  So at
 5   noon -- I'm sorry, this is the wrong
 6   one.  This is her note to me on Tuesday
 7   at 12:00.  I sent a note back to her on
 8   Tuesday afternoon -- sorry.  So 9:00 in
 9   the morning on the 5th -- I forwarded it
10   at 9:00 in the morning.  But when did I
11   write it?
12         PROFESSOR GOULD:  It looks like
13   Tuesday evening, there in the corner.
14         PROFESSOR RIESMEYER:  Tuesday at
15   five.
16         DEAN WILLIAMS:  Okay.  Tuesday
17   at -- yeah, Tuesday at 5:00 -- 5:06.
18         So, Tuesday afternoon at 5:00.
19   And I asked for a response by Wednesday
20   at 5:00.
21         _____:  And is that the
22   typical amount of time students are
23   given to respond?
24         DEAN WILLIAMS:  Yeah, I mean, I
25   think -- I gave her all of this
```



```
 1                 Proceedings
 2     information with including, you know,
 3     the papers.  These are the
 4     pink-highlighted papers showing the
 5     similarities --
 6           ▓▓▓▓▓:  And that was after an
 7     agreement was attempted to be reached?
 8           DEAN WILLIAMS:  That was -- she
 9     and I had a conversation -- so we had a
10     conversation on the 3rd, and then we had
11     further -- I asked for that additional
12     information.  I sent this to Trisha on
13     the 4th at 5:00, asked for a response by
14     the 5th at 5:00, and then with an
15     explanation of the process.
16           ▓▓▓▓▓:  Ms. Tshudy, what would
17     have been the outcome of the agreement
18     if you had decided to agree with what
19     had been asked?  So there was an
20     agreement that was attempted to be made
21     before, but you did not want to agree to
22     it because it would have required you to
23     admit to everything explicitly?  I
24     guess, what would the outcome have been?
25     Like, what would have been the sanction
```

```
 1                 Proceedings
 2     or the consequence?
 3           MS. TSHUDY:  I assume that it
 4     would, likely, be up to Dean Williams.
 5           I just wanted the chance to, at
 6     least, show all the precautions that I
 7     did and, at least, explain my story that
 8     in my mind -- obviously, I've written
 9     many papers before, never had any of
10     this happened, was blindsided by this
11     and wanted to understand how this
12     possibly could have come.  But it was
13     hard not getting that chance.
14           And trying to explain in such a
15     short amount of time because,
16     obviously -- I think you probably could
17     have seen that -- we sent emails back
18     and forth with one another where I was
19     trying to send her all this info to kind
20     of get my story out.
21           And I told her, when it had to
22     come to this, I was literally like, if I
23     could avoid this I would and I'm sorry
24     that I can't explain it, in short -- I
25     can't explain it short enough, that I
```

```
 1                 Proceedings
 2     really would like just the ability to
 3     expound on it because a significant
 4     amount of what is shown as copying is
 5     literally citations and stuff from other
 6     cases -- other stuff that I cited to.
 7     It's actually interesting if you would
 8     eliminate from my paper stuff that is
 9     directly taken that is cited too
10     properly from the primary source and
11     stuff, I think it would show much
12     different picture.
13           But again it was just so quick
14     that I couldn't.  So I had no idea
15     because I've never experienced this
16     process before, I had no idea what to
17     expect.  She was very -- kind enough to
18     send me, you know, everything that
19     addresses plagiarism and stuff and,
20     like, I talked to her and explained that
21     I am no way over-assuming my ability
22     this semester.  And I could honestly see
23     myself making mistakes just from how it
24     was I tried to prevent those mistakes.
25     And so I'm not going to deny that that
```

```
 1                 Proceedings
 2     happened.
 3           What caught me was that -- I
 4     literally looked up the plagiarism
 5     definition and it was "intentionally"
 6     and "knowingly."  And from what I saw in
 7     the paper, things -- other than that one
 8     paragraph that I couldn't explain to her
 9     and I admitted I couldn't --
10     literally -- have no idea -- other than
11     that one paragraph, most of it is just
12     because we're talking about the same
13     thing with, you know, the same cases,
14     but if you look at what's usable in
15     those cases it would be the same
16     quotation.
17           So to me it was the hope to be
18     able to eliminate what was obviously
19     just generic.  Like the first sentences
20     in my paragraph, I didn't include a
21     statistic because -- I probably should
22     have, if I had time.  But it was just so
23     used in so many papers, like everything
24     there.  Like, I didn't use anything
25     specific or anything like that because
```

